**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Abraham, Inc. dba Marathon Food Center, *et al.*, | : | Case Number: 2:18-cv-1306 |
| | : | |
| Plaintiffs, | : | Judge Edmund A. Sargus, Jr. |
| | : | |
| v. | : | Chief Magistrate Judge Elizabeth P. Deavers |
| | : | |
| United States of America | : | **[ORAL ARGUMENT REQUESTED]** |
| | : | |
| Defendant. | : | |

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**AND**

**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

---

Now come Plaintiffs, by and through their undersigned counsel, and respectfully submit their Memorandum in Opposition to Defendant's Motion for Summary Judgment. Contemporaneously with Plaintiffs' Memorandum, Plaintiffs respectfully move for summary judgment in their favor, on the basis that Plaintiffs' evidentiary support submitted herein entitles Plaintiffs to judgment as a matter of law. The bases for Plaintiffs' Memorandum in Opposition

1

and concomitant Cross-Motion for Summary Judgment are more fully set forth in the accompanying Memorandum in Support.

Respectfully submitted,
**LUPER NEIDENTHAL & LOGAN**
A Legal Professional Association


/s/ Matthew T. Anderson
_____
Matthew T. Anderson  (0082730)
1160 Dublin Road, Suite 400
Columbus, Ohio 43215-1052
Phone: (614) 221-7663
Fax: (866) 345-4948
Email: manderson@LNLattorneys.com
*Attorney for Plaintiffs*

**COMBINED TABLE OF CONTENTS
AND SUMMARY PURSUANT TO S.D. OHIO CIV. R. 7.2(a)(3)**

**TABLE OF AUTHORITIES**…………………………………………………..  **6**

**I.     INTRODUCTION AND NATURE OF CASE**………………………………  **8**

Based on unproven speculated "patterns" of behavior, Defendant has wrongfully concluded that Marathon Food Center engaged in illegal "trafficking" of food stamps. The evidence submitted herein by Marathon unequivocally contradicts and rebuts the government's allegations in strict accordance with the law. Marathon is entitled to judgment in its favor and a reversal of Defendant's decision to disqualify Marathon from accepting SNAP.

**II.    STATEMENT IN SUPPORT OF REQUEST FOR ORAL ARGUMENT**…….  **10**

Due to the complexities of this litigation, Marathon respectfully suggests that the Court's review of the Parties' respective positions would be significantly aided by oral argument.

**III.   FACTUAL BACKGROUND**…………………………………………………...  **10**

         **A.     The Plight of the SNAP Recipient**                          **10**

Limited access of low-income people to supermarkets in USDA-categorized "food deserts" is a significant problem. While SNAP helps ease some of these challenges, it is of little use if they do not have access to food desert stores accepting SNAP benefits.

         **B.     The Abrahams' Journey to America**………………………………...  **11**

After escaping his war-torn home country, Araia Abraham and his family emigrated to America, where he applied for and obtained his U.S. citizenship. After years of honest and hard work, and dreams of entrepreneurship, Araia has made a net-positive contribution to the U.S. economy for the past 25 years.

         **C.     Marathon Food Center: Background**……………………………….  **13**

Araia, through his corporation Abraham, Inc. ("Abraham"), began operating the Marathon Food Center in early 2002.  His nephew, Abner Knife, has managed it since this time.

         **D.     Marathon's Location: A Food Desert Where Residents Are Categorized
                  by the USDA as Having Low Income and Limited Access to Food**…….  **14**

Marathon Food Center is located at 1401 Sullivant Avenue in Columbus, a very poor residential area classified by the USDA as  a "food desert," a low-income area with limited access to food, and also considered to be a "low vehicle access" area.

**E.**     **Marathon's Customer Base and Its Shopping Patterns**...................   **15**

The socioeconomic status of neighborhood residents results in many having an atypical schedule. Shopping patterns such as buying food/groceries after midnight is common. Marathon is the only store in the area open with mostly 24/7 hours to meet this need.

**F.**     **Typical EBT Transactions and Accompanying Shopping Patterns**.......   **21**

Given the nature of the SNAP/EBT program, it is not uncommon for SNAP recipients to spend a great deal of their monthly benefits within a short time after receiving it each month.

**G.**     **Marathon's Pricing Model and Inventory**..............................   **22**

Being a small family-run food center, Marathon does not subscribe to the pricing and marketing models followed by many larger stores, as those models simply do not apply to Marathon. Marathon prices its food and stocks its inventory with one purpose: to sell.

**H.**     **The Government's Decision Based On Cherry-Picked Statistics and**
          **Unproven Speculated "Patterns"**..............................................   **25**

Defendant identified only three (3) isolated "patterns" of activity suggesting SNAP trafficking and only analyzed 5 SNAP households having shopped at Marathon.

**I.**     **The Government's Lack of Any Investigatory Process and Its**
          **Haphazard Site Review** .......................................   **26**

Defendant's investigation was incomplete and speculative, including a government contractor's 30-minute walk-though under the guise of a "standard process" resulting in inaccurate information, on which the Defendant's decision was based.

**IV.**    **LAW AND ARGUMENT**.................................................   **30**

**A.**     **Summary Judgment Standard Generally**.............................   **30**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." As demonstrated herein, Defendant's Motion for Summary Judgment should be denied and Marathon's Cross-Motion should be granted as a matter of law.

**B.**     **Judicial De Novo review of a SNAP Disqualification**......................   **32**

Under the SNAP statute, the district court shall conduct a "trial de novo" to "determine the validity of the questioned administrative action." 7 U.S.C. § 2023(a)(15). Whether a violation exists is examined anew, allowing the aggrieved store with the ability to introduce evidence beyond the original, administrative record.

**C.**     **Evidentiary Requirements in SNAP Disqualification Cases**...............  **32**

To survive summary judgment in a SNAP case, a plaintiff must raise material issues of fact as to each alleged violation. Here, Marathon specifically rebuts each transaction identified by the Defendant as "trafficking," thus meeting the evidentiary requirements.

**D.**     **Marathon Did Not Engage in Any Instances of Trafficking**...............  **35**

**1.  An Unusual Number of Transactions Ending in a Same Cents Value**.................................................................................  **36**

Defendant's first suggestion of trafficking is that a certain number (a mere ▉ ) of Marathon's EBT transactions over a 6-month review period ends in 89 cents. Marathon has reviewed and rebutted each of the ▉ flagged transactions, per evidentiary requirements.

**2.  Repetitive Transactions in a Set Period of Time by the Same Household**.................................................................  **45**

Defendant's second suggestion of trafficking is that multiple withdrawals were made from the same SNAP recipient in a set period of time. Marathon has reviewed and rebutted each of the ▉ flagged transactions, per evidentiary requirements.

**3.  Excessively Large Purchase Transactions Were Made from Recipient Accounts**.........................................................  **55**

Defendant's third suggestion of trafficking is that a series of EBT transactions (a mere ▉ ) at Marathon appeared to be "excessively large" based on store type and food inventory. Marathon has reviewed and rebutted each of the ▉ flagged transactions, per evidentiary requirements.

**4.  Individual Household Analysis**......................................  **79**

Defendant's investigation embarked on a perceived "Individual Household Analysis," cherry-picking only five SNAP recipients for whom to conduct a further review of their transactions. Marathon has reviewed and rebutted all transactions identified by the within each of the five households, outlined as subparagraphs (a) through (e).

**5.  Marathon's Credit and Debit Card Transactions**.....................  **85**

Marathon has conducted a review of credit and debit card transactions for its store within a fifteen-month period ranging from September 2017 through November 2018. This review shows these transaction "patterns" are no different than the type of EBT transaction "patterns" which Defendant suggests are indicative of "trafficking."

**V.    SUMMARY OF EVIDENCE SUBMITTED BY MARATHON**...................  **95**

**VI.   MARATHON IS ENTITLED TO SUMMARY JUDGMENT**.....................  **96**

**VII.  CONCLUSION**.................................................................  **97**

5

# **TABLE OF AUTHORITIES**

***Cases***

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505 (1986) _____ 31

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) _____ 31, 97

*Four Winds Behavioral Health v. United States*, D.N.M. No. 19-212 SCY/LF, 2020 U.S. Dist. LEXIS 124534, at *20 (July 15, 2020) _____ 34, 44, 55

*Ganesh v. United States*, 658 Fed.Appx. 217, 221 (6th Cir.2016) _____ passim

*Hanna,* No. 04–74627, 2007 WL 1016988_____ 32

*Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996)_____ 31

*Kahin v. United States,* 101 F.Supp.2d 1299, 1303 (S.D.Cal.2000)) _____ 32

*Kim v. United States,* 121 F.3d 1269, 1274 (9th Cir. 1997) _____ 32, 33

*Livingston Christian Schools v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir.2017) ____ 19

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986) _____ 31

*McClain's Mkt. v. United States*, 214 Fed.Appx. 502, 505 (6th Cir.2006)_____ passim

*McCray v. United States,* 511 F.Supp. 205, 209 (E.D.Mich.1981) _____ 32

*Redmond v. United States,* 507 F.2d 1007, 1011-1012 (5th Cir. 1975)._____ 32

*Saunders v. United States*, 507 F.2d 33, 36 (6th Cir. 1974) _____ 32

*Skyson USA, LLC v. United States*, D.Haw. No. 09-00278 BMK, 2010 U.S. Dist. LEXIS 15108, at *12-13 (Feb. 22, 2010) _____ passim

*St. v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989) _____ 31

*Warren v. United States,* 932 F.2d 582, 586 (6th Cir. 1991) _____ 32

***Statutes***

7 U.S.C. § 2011_____ 11

7 U.S.C. § 2023(a)(15) _____ 32

U.S.C. § 2011; *id.* at § 2013(a) _____ 11

*Other Authorities*

83 Fed. Reg. 8013, 8013 (Feb. 23, 2018) _____ 11

Food Access Research Atlas, USDA, Economic Research Service,
   https://www.ers.usda.gov/data-products/food-access-research-atlas/go-to-the-atlas/ (updated
   Aug. 26, 2020) _____ 15

Franklin County Auditor,
   http://property.franklincountyauditor.com/_web/Datalets/Datalet.aspx?sIndex=2&idx=1) _ 17

USDA SNAP Training Guide for Retailers, https://fns-
   prod.azureedge.net/sites/default/files/media/file/Retailer-Training-Guide.pdf _____ 25

USDA, Economic Research Service, *Economic Information Bulletin Number 165* (Jan. 2017),
   https://www.ers.usda.gov/webdocs/publications/82101/eib-165.pdf?v=0 _____ 12

USDA, Economic Research Service, https://www.ers.usda.gov/amber-
   waves/2019/july/quantifying-the-impact-of-snap-benefits-on-the-us-economy-and-jobs/? (July
   2019) _____ 22

USDA, Economic Research Service, https://www.ers.usda.gov/data-products/food-access-
   research-atlas/documentation/ (updated Oct. 31, 2019) _____ 14

USDA, Food & Nutrition Serv. (updated March 3, 2020), https://www.fns.usda.gov/snap-
   retailer-authorization_____ 31

USDA, Food & Nutrition Serv., *A Short History of SNAP* (Sep. 11, 2018),
   https://www.fns.usda.gov/snap/short-history-snap (recognizing the country's "severe domestic
   hunger problem in the latter half of the 1980s")_____ 12

*Rules*

Fed. R. Civ. P. 56(c)(1)_____ 31

Federal Civil Rule 201(b) _____ 19

Federal Rule of Evidence 1006_____ 86

Federal Rule of Evidence 201(b)(2) _____ 13

Rule 56(a) of the Federal Rules of Civil Procedure _____ 31

*Regulations*

Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (1964)_____ 11

<u>**MEMORANDUM IN SUPPORT**</u>

**I.**   <u>**INTRODUCTION AND NATURE OF THE CASE**</u>

Lack of access to supermarkets and grocery stores leads our poor and low-income people to buy less quality, higher priced foods at opportune locations such as convenient stores.  That is the situation in play here.  Low income people regularly shop at Marathon Food Center for their groceries because they lack access to supermarkets or larger grocery stores.  Plaintiffs' Marathon store (collectively referred to as "Marathon" or "Marathon Food Center") is smack dab in the middle of an urban center specifically identified by the United States Department of Agriculture ("USDA") as having low income and low access to supermarkets, an area otherwise known as a food desert.

In this case, armed only with cherry-picked statistics and unproven speculated "patterns" of behavior of persons over whom Plaintiffs have no control, the United States of America ("Defendant") has unequivocally and wrongfully concluded that Marathon Food Center has engaged in illegal "trafficking" of food stamps.

The federal government presents only conclusory, speculative, and factually erroneous information to support its contention that Marathon exchanged Supplemental Nutrition Assistance Program ("SNAP") benefits for cash.  While viewing the Administrative Record with the blinders supplied by the government may allow for inferences in favor of Defendant's arguments, as the government would have this Court believe, in actuality the Defendant's "Case Analysis Document" contains nothing more than speculation and innuendo that the subject households were "more likely than not obtaining cash for their SNAP benefits."  In sum, the government cherry picked its statistics and limited the data contained in its review to a light only favorable to the government's position.

In response, Marathon has reviewed every single "flagged" transaction identified by the government as suggestive of "trafficking" and, in response, herein submits a specific factual rebuttal of each and every "flagged" transaction.  Notably, and dispositive of this case, the government can present no factual evidence to counter Marathon's position.

Ultimately, this case is David versus Goliath or the Alamo Native Americans versus the Anglo settlers.  The process by which Defendant is able to attack a SNAP retailer, using the behaviors and spending habits of its customers to not only imply, but affirmatively conclude, that the retailer is breaking the law is so arbitrary and one-sided that it borders on abusive.  In fact, the federal government, with its nearly unlimited resources, simply throws its weight around and beats on the little guy – because it can.

Marathon Food Center respectfully submits that Defendant's Motion for Summary Judgment should be denied and that instead, Marathon is entitled to summary judgment in its favor, reversing Defendant's decision to disqualify Marathon from accepting SNAP benefits.  Based upon the evidence submitted herein by Marathon, which unequivocally contradicts and rebuts every single one of the government's conclusory allegations, Marathon is entitled to judgment in its favor.

To deprive the Abraham family of its livelihood based on circumstantial, disputed, and speculative data is the harshest of remedies.

Marathon submits that it has never engaged in SNAP benefit trafficking and has never exchanged or offered to exchange SNAP benefits for cash.  Similarly, Marathon has never sold ineligible items in exchange for SNAP benefits.  Marathon Food Center provides reasonable and truthful explanations for each of the questioned transactions, which evidence shows that

Defendant's speculative assertions cannot be supported by any evidence. Defendant simply cannot rebut Marathon's evidence, thus requiring summary judgment in Marathon's favor here.

## II.    <u>STATEMENT IN SUPPORT OF REQUEST FOR ORAL ARGUMENT</u>

This case of judicial review involves a total of ■ SNAP transactions "flagged" by a government algorithm as indicative of "trafficking." Inherent in this litigation are several complexities, both factually and legally. While Defendant would have this Court believe that its "one-size-fits-all" algorithm is without flaws, that is not the case.

Marathon's request for review of the Agency Decision requires a deep dive not only into the accounting and mathematics behind these so-called "flagged" transactions, but it requires a review of the socioeconomic dynamics of Marathon's neighborhood and the inherent purchase patterns of low-income families who live in an area categorized by the government itself as a food desert.

Marathon Food Center therefore respectfully suggests that the Court's review of the Parties' respective positions would be significantly aided by oral argument. For these reasons, Marathon respectfully requests that the Court hear the summary judgment briefs on oral argument.

## III.    <u>FACTUAL BACKGROUND</u>

### A.    <u>The Plight of the SNAP Recipient</u>

For years, the United States has set up programs to ensure that low-income Americans and their families do not go hungry. The largest joint federal-state effort to reduce hunger is SNAP, formerly and still commonly referred to as the food stamp program. Congress created SNAP in 1964 "to alleviate . . . hunger and malnutrition" by providing "supplemental nutrition assistance" to "low-income households." 7 U.S.C. § 2011; *see also* Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (1964). SNAP offers non-cash benefits that can be used to buy eligible food at

approved retail stores.  *See* 7 U.S.C. § 2011; *id.* at § 2013(a).  The program served an average of 42.1 million recipients per month in fiscal year 2017.  *See* 83 Fed. Reg. 8013, 8013 (Feb. 23, 2018).

The limited access of low-income people to supermarkets in USDA-categorized "food deserts" is a significant problem in our country.  According to the USDA, "[l]imited access to supermarkets or other sources of healthy and affordable food may impede the ability of some Americans to eat a healthy diet."  *See* USDA, Economic Research Service, *Economic Information Bulletin Number 165* (Jan. 2017), https://www.ers.usda.gov/webdocs/publications/82101/eib-165.pdf?v=0.  "Income, transportation, and distance may be barriers to food access for some."  *Id*.

And that is exactly the plight of the SNAP recipient, particularly in an urban area like Sullivant Avenue on the near west side of Columbus, an area specifically defined by the USDA census as being a food desert – having low income and low access to food.  *Id*.  SNAP is undoubtedly the "safety net" for children, families, seniors, and disabled individuals across the nation and is one of the most effective programs to help meet the immediate needs of its recipients.

While many households have faced, and continue to face, unprecedented challenges during the current COVID-19 pandemic, the unfortunate reality is that millions of households have been facing the same challenges for years – hunger, thus relying heavily upon their SNAP benefits to provide some access, albeit limited access, to food.  *See* USDA, Food & Nutrition Serv., *A Short History of SNAP* (Sep. 11, 2018), https://www.fns.usda.gov/snap/short-history-snap (recognizing the country's "severe domestic hunger problem in the latter half of the 1980s").  That is where SNAP retailers enter the equation and what ultimately gives rise to the instant lawsuit.

### B.    The Abrahams' Journey to America

One of the most contentious topics in today's political environment is that of immigration reform.  A popular argument, depending on where one stands, is that immigrants abuse our welfare

system and take advantage of government "handouts," SNAP included. What does not receive enough attention is the immigrant family on the other side of that argument, like the Plaintiff in this case, who has made – and continues to make – a distinct net-positive contribution to the United States economy, and has done so for almost 25 years.

In 1962, the country of Eritrea (in Africa) was forced to officially absorb into Ethiopa, which began a 30-year armed struggle for independence, now known as the Eritrean War of Independence.[1] (Declaration of Abner Knife, attached as Exhibit 1, at ¶ 3). It was during this 30-year war that Araia B. Abraham ("Araia") was born in Eritrea and, in 1981, forced to flee with his family to the neighboring country of Sudan to escape the imprisonment and torture of fellow Eritreans. (*Id*. at ¶ 3). He and his wife spent the next three to four years in a Sudanese refugee camp where they welcomed the birth of their daughter. (*Id*. at ¶ 5). In 1984, with the help of the Catholic Church, Araia and his family emigrated to Memphis, Tennessee with dreams of a better life. (*Id*. at ¶ 6). Araia applied for and obtained United States citizenship shortly after his arrival. (*Id*. at ¶ 7). He immediately started working two to three jobs to support his family, while his wife worked two jobs at a laundromat and supermarket. (*Id*. at ¶ 8). Thanks to their hard work, life started to improve; and Araia was able to sponsor his nephew, Abner R. Knife ("Abner"), to also emigrate to the United States, at 21 years of age, from Eritrea. (*Id*. at ¶ 9.). Both Araia and Abner are naturalized United States citizens; and they are proud Americans. (*Id*. at ¶10).

In or around 2001, the Abraham family moved to Columbus, Ohio. (Ex. 1 at ¶ 11). Shortly thereafter, Araia obtained an opportunity to operate Marathon Food Center located at 1401 Sullivant Avenue in Columbus, which Abner has been managing since the beginning. (Ex. 1 at ¶

---

[1] The Court can take judicial notice of historical events under Federal Rule of Evidence 201(b)(2) because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

12).[2]  To the best of Abner's recollection, Marathon has never been the subject of an investigation by any governmental or regulatory agency, until 2017 when Marathon was falsely accused of SNAP/EBT trafficking, which is the subject of this lawsuit.  (Ex. 1 at ¶ 13).

### C.    Marathon Food Center:  Background

Araia, through his corporation Abraham, Inc. ("Abraham"), began operating the Marathon Food Center in early 2002.  (Ex. 1 at ¶ 14).  Abraham filed its trade name, Marathon Food Center, with the Ohio Secretary of State on April 10, 2002, and soon thereafter opened for business.  (Ex. 1 at ¶ 15).

Marathon Food Center submitted its application to participate in the SNAP program on June 27, 2002 and was approved shortly thereafter.  (Ex. 1 at ¶ 15).  Abner has worked at, and helped manage, Marathon since it was opened by Araia in 2002.  (Ex. 1 at ¶ 16).  Abner is considered the General Manager of Marathon.  (Ex. 1 at ¶ 17).

During the relevant time period under which the federal government undertook its review of Marathon's Electronic Benefit Transfer ("EBT") transactions (September 2017 – February 2018), and continuing through the present day, Abner is and always has been responsible for managing the entirety of the store's business operations, some functions of which include running the cash register; inventory management; pricing; SNAP compliance; and accounting.  (Ex. 1 at ¶ 18).  Toward that end, Abner works upwards of 12-16 hours per day, at least, well over 60 hours per week, and, often more than 80 hours per week to keep Marathon Food Center afloat and to help make ends meet for his family.  (Ex. 1 at ¶ 19).

---

[2] Attached as Exhibit 15 is a photograph of Abner proudly standing in his family's Marathon store.

**D.** **Marathon's Location:  A Food Desert Where Residents Are Categorized by the USDA as Having Low Income and Limited Access to Food**

Marathon Food Center is located at 1401 Sullivant Avenue in Columbus, at the corner of Sullivant and Central Avenues, a prototypical food desert.  (Ex. 1 at ¶ 20).  The USDA considers a "food desert" to be a low-income neighborhood with "limited access to supermarkets, supercenters, grocery stores, or other sources of healthy and affordable food."  USDA, Economic Research Service, https://www.ers.usda.gov/data-products/food-access-research-atlas/documentation/ (updated Oct. 31, 2019).  These food deserts are considered "low income, low access," with "low access" meaning a limited access to food.  *Id.*

The Sullivant Avenue area where Marathon is located is traditionally a very poor residential area in a depressed neighborhood, hence its classification by USDA as a low-income, low access census tract.  *See* Food Access Research Atlas, USDA, Economic Research Service, https://www.ers.usda.gov/data-products/food-access-research-atlas/go-to-the-atlas/ (updated Aug. 26, 2020).  (*See also* Ex. 1 at ¶ 20).  There are several low-income housing units within a short radius of Marathon, and many of the neighborhood's residents obtain some type of governmental assistance such as SNAP benefits.  (Ex. 1 at ¶¶ 23, 25).  With this neighborhood dynamic, these streets are also home to many homeless, displaced, and transient persons.  (Ex. 1 at ¶ 26).

This Sullivant Avenue area is also categorized by USDA as a "low vehicle access" area, meaning that this is a census tract in which more than 100 households have no access to a vehicle and are more than one-half mile from the nearest supermarket.  *See* Food Access Research Atlas, USDA, Economic Research Service, https://www.ers.usda.gov/data-products/food-access-research-atlas/go-to-the-atlas/ (updated Aug. 26, 2020).

Along these lines, affiant ███████████ who herself depends on SNAP benefits, attests to this very statistic, in that she does not have a vehicle to drive.  (Declaration of ███

14

███ attached as Exhibit 12, at ¶ 15). As such, she prefers Marathon because it is "in the neighborhood." (*Id*. at ¶ 3). ███ also prefers to make more and larger purchases, especially after receiving her benefits each month, so that she need not make multiple trips to the store, given that she is on foot and without a vehicle. (*Id*. at ¶¶ 11, 14, 15).

E.    **Marathon's Customer Base and Its Attendant Shopping Patterns**

During the relevant review period (September 2017 – February 2018), Marathon Food Center was typically open 24 hours per day, 7 days per week. (Ex. 1 at ¶ 30). This is extremely uncommon, even for the small local convenience store or gas station. (*Id*.) Marathon believes its store to be the only food market operating with those hours within a several-mile radius. (*Id*. at ¶ 37). The community has embraced Marathon because it is a place for its residents to purchase food and other necessary items at all hours of the night. (Ex. 1 at ¶ 32). For example, three of Marathon's long-time customers, all of whom receive SNAP benefits, attest that Marathon is open much longer than other stores in the area, which is an extra convenience for the customer. (Ex. 12 at ¶ 9; Declaration of ███ attached as Exhibit 13 at ¶ 8; Declaration of ███ attached as Exhibit 14 at ¶ 9).

Based on the socioeconomic status of the neighborhood residents, many of them do not necessarily have prototypical daily schedules like the average working American. (Ex. 1 at ¶¶ 34-35). Consequently, their shopping patterns are unique, and different, such as buying food/groceries after midnight. (*Id*. at ¶ 36). Being the only store open for miles, it is not uncommon for customers to shop after midnight, which was even more common when Marathon was accepting SNAP benefits. (*Id*. at ¶ 37). Marathon thus serves an essential purpose in its neighborhood, being the only food store, in a confirmed food desert, open all hours of the night. (Ex. 1 at ¶ 38). In short, the shopping patterns may not be typical for some people, like privileged Americans, ██ they are

15

typical for low-income persons such as the minimum wage McDonald's employee who works until midnight. (*Id*. at ¶ 39). In that case, it is certainly within the norm to shop for groceries after midnight; and of course, the only food store in the neighborhood open at that time is Marathon. (*Id*. at ¶ 40). At that hour, Marathon serves as an oasis in a food desert. (*Id*.).

To keep up with the ever-changing needs of its customers, Marathon offers a wide array of items and services for sale. (*Id*. at ¶ 41). In addition to regular grocery and SNAP-eligible items (meats, frozen foods, canned goods, cereal, snacks, and other dry goods), Marathon sells or offers money orders and money transfer services; bill pay services; pre-paid calling cards and pre-paid phones, services typically used by immigrants; check cashing services; lottery tickets; alcohol and tobacco products; and health/beauty aids. (*Id*. at ¶ 42). This is important for Marathon customers. (*Id*. at ¶ 42). Marathon also has a limited selection of clothes for sale. (*Id*. at ¶ 43).

Marathon is listed as being 2,692 square feet, which includes freezer/cooler space and the area behind the counter. (*Id*. at ¶ 44; *see also* Franklin County Auditor, http://property.franklincountyauditor.com/_web/Datalets/Datalet.aspx?sIndex=2&idx=1).

During the relevant time period, only three (3) individuals worked the cash registers at Marathon: Abner, Hamat Sowe ("Hamat"), and Yodit Arefaine ("Yodit"). (Ex. 1 at ¶ 45; Declaration of Hamat Sowe, attached as Exhibit 4, at ¶¶ 1, 3; Declaration of Yodit Arefaine, attached as Exhibit 5 at ¶¶ 1, 3). During this timeframe, Hassan Abdallah worked at Marathon to help with stocking the shelves, cleaning the store, and other general responsibilities assigned by Abner. (Ex. 1 at ¶ 46). Hassan did not work the cash register. (*Id*.).

The clientele who frequent Marathon often mill about inside and outside of the store. (Ex. 1 at ¶ 47). This happens constantly, with very high frequency, at all hours of the night. (*Id*. at ¶ 48). Many of the store's customers are not gainfully employed, or they otherwise have atypical

16

and random schedules.  (*Id*. at ¶ 49).  Marathon Food Center can serve as a neighborhood meeting place, essentially giving residents something to do, which might be typical in other countries from where they hail.  (*Id*. at ¶ 50).  This gives Marathon customers an opportunity to visit with their fellow neighbors at the local neighborhood store, while also visiting with Abner. (*Id*. at ¶ 51). Perhaps it also gives them a sense of camaraderie.  (*Id*. at ¶ 52).  Exhibited with this behavior is the tendency to make several purchases within a very short timeframe (within minutes in many cases), going in-and-out and in-and-out of the store.  (*Id*. at ¶ 53).  This is a very common practice. (*Id*.).  While this may seem to be strange behavior for privileged Americans, unfortunately it is simply the way of life for many of our country's poor and low-income families.  (*Id*. at ¶ 54).

It is not unusual for homeless persons and homeless families to shop at Marathon Food Center.  (*Id*. at ¶ 55).  In fact, homeless persons often find transportation to Marathon from friends or relatives.  (*Id*. at ¶ 56).  It is also not unusual for several homeless persons to band together to take turns purchasing food for the group.  (*Id*. at ¶ 57).  Sometimes, homeless persons spend a significant portion of their benefits in one shopping transaction: (i) in order to feed other homeless persons in a communal setting and without access to cooking elements and (ii) due to a lack of transportation.  (*Id*. at ¶ 58).

Bearing this out, the information received by Marathon in response to a subpoena served on Ohio Department of Job and Family Services ("ODJFS") shows that two of the SNAP recipients identified in the government's "trafficking investigation" are homeless.  (*See* Exhibit 7, SNAP ██████████████████████████████████████ *see also* Exhibit 6).[3]  Specifically, ODJFS does

---

[3] In response to a subpoena served upon ODJFS, ODJFS produced names and contact information of certain SNAP recipients having SNAP Household numbers for whom Marathon requested names and contact information pursuant to its subpoena.  A copy of this information was also produced to Defendant.

not have an address identifier in its documentation for these two SNAP recipients, instead identifying them as being "displaced." (*Id*.)

Marathon does not provide any shopping carts or baskets for its customers. (Ex. 1 at ¶ 59; Ex. 12 at ¶ 11; Ex. 13 at ¶ 10; Ex. 14 at ¶ 11). Consequently, those customers desiring to purchase multiple food and beverage items who are shopping by themselves and are unable to carry a full load in both arms must make multiple trips to the cash register, often resulting in multiple transactions in only a very short period of time. (Ex. 1 at ¶ 60; Ex. 12 at ¶ 11; Ex. 14 at ¶ 11). This would be typical, for example, with the McDonald's employee shopping for groceries after the night shift. (Ex. 1 at ¶ 61).

With no shopping carts or bins to carry groceries, those customers having no second or third set of hands with them have no choice but to make multiple trips to the counter to purchase groceries. (Ex. 1 at ¶¶ 60, 62; Ex. 12 at ¶ 11; Ex. 13 at ¶ 10; Ex. 14 at ¶ 11). As attested by Affiants ████████████████████ both of whom use SNAP benefits, they often will make multiple trips to the counter due to the lack of shopping carts or baskets and because they can only carry so much at a time in their arms. (Ex. 12 at ¶ 11; Ex. 14 at ¶ 11). Affiant ████████████████ on the other hand, often brings her own shopping bag when purchasing multiple items, due to the lack of shopping carts or baskets. (Ex. 13 at ¶10). Otherwise, she attests, she would need to make multiple trips to the Marathon store. (*Id*.).

While it may seem to be an easier shopping run to visit a supermarket like Kroger or Giant Eagle, the distinguishing factor is that Kroger and Giant Eagle are not only closed this time of night, but they are far away, hence the USDA classification of this area being a food desert with low income and limited access to supermarkets. (Ex. 1 at ¶¶ 63-65). Along these lines, the Aldi store within a half-mile of Marathon closes at 8 pm every day. (Ex. 1 at ¶ 64). *See also*,

https://www.aldi.us/stores/en-us/Search?SingleSlotGeo=Columbus%2C+OH.[4]    The    closest

Kroger appears to be 1.9 miles away and the closest Giant Eagle 3.2 miles away.  *See Livingston*

*Christian Schools v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir.2017) (holding that the

court may take judicial notice of maps showing the distances between these locations).  (Ex. 1 at

¶ 64).

Other customers of Marathon may shop with their family members who can assist in

carrying groceries together to the check-out counter, and then assist with carrying the groceries

while walking back home.  (Ex. 1 at ¶ 66).  Other families or groups shopping together will

typically conduct separate transactions at the counter.  (*Id*. at ¶ 67).  This is a fairly common

practice, as one family member will collect various food items and take them to the cash register

for checkout, while other family members are still browsing the aisles.  (*Id*. at ¶ 68).  Or, in some

cases, one family member will finish a shopping transaction and then give the household's

Electronic Benefits Transfer ("EBT") card to another person in the household, such that each

person will have conducted his/her own transaction.  (*Id*. at ¶ 69).  The process at Marathon is to

process the transaction and collect payment for those food items placed on the counter for purchase

and not "hold open" the sale until all family members are finished shopping.  (*Id*. at ¶ 70).  There

are several reasons for this policy.  (*Id*. at ¶ 71-77).

Marathon is a busy food center, especially during off-peak hours.  (Ex. 1 at ¶ 71).  Other

customers are waiting in line or otherwise waiting to purchase goods and services, some of which

are very quick, one-time purchases.  (*Id*. at ¶ 72).  The cashier does not delay, or hold up, the line

on account of additional family members or friends finishing their shopping.  (*Id*. at ¶ 73).  Affiants

---

[4] The Court can take judicial notice of Aldi's operating hours under Federal Civil Rule 201(b), seeing that Aldi's store location hours can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned (i.e. from Aldi's own website).

█████████████████ attest to this fact, all of whom appreciate the speedy service offered at Marathon.  (Ex. 12 at ¶ 8; Ex. 13 at ¶ 7; Ex. 14 at ¶ 8).  Further, with limited counter space, conducting separate transactions allows the first family member to collect the purchased groceries and exit the cashier area.  (Ex. 1 at ¶ 75).

Conducting transactions quickly also contributes to store safety.  (*Id*. at ¶ 76).  While Abner knows most of his customers well, the store is nonetheless in a depressed neighborhood with a high crime rate.  (*Id*. at ¶ 77).  For that reason, Marathon prefers to conduct its transactions quickly, especially late at night, to avoid having a line form or otherwise have people congregate near the front of the store near the register.  (*Id*.).  Having worked at Marathon Food Center since 2002, Abner can handle up to five transactions in a single minute.  (*Id*. at ¶ 78).  He is that quick with the register, as any seasoned cashier (like Abner) could attest.  (*Id*.).

In addition, EBT cards have a declining balance, not unlike debit and ATM cards.  (*Id*. at ¶ 79).  During the time within which Marathon was accepting SNAP benefits, many transactions would be declined because the balance was not sufficient, as not all SNAP recipients keep track of their remaining balance throughout the month.  (*Id*. at ¶ 80).  By conducting separate transactions, as opposed to waiting on other family members to purchase additional groceries, Marathon increases the likelihood that each sale is approved and EBT benefits are sufficient.  (*Id*. at ¶ 81).  Otherwise, the cashier may need to leave the register to put the food away in the case of a rejected transaction.  (*Id*. at ¶ 82).  Besides the obvious inconvenience of regularly restocking items, there is also a safety issue for the cashier who cannot be distracted with restocking, especially during the late-night hours.  (Ex. 1 at ¶ 83).  Furthermore, Marathon customers are not always aware of their exact balance on their EBT card.  (*Id*. at ¶ 84).  Customers will therefore make multiple transactions to obtain a balance after the first transaction.  (*Id*)  After the first

transaction is approved, the customer is provided a receipt confirming the remaining balance on the EBT card, avoiding the embarrassment of a declination.  (*Id*. at ¶ 85).  Unfortunately, to add to this issue, some of Marathon's customers do not have a high level of literacy, which means they are often forced to "guess" as to what amounts can be purchased when they reach the counter for checkout.  (*Id*. at ¶ 86).  Smaller transactions make it less likely that the purchase will be declined. (*Id*. at ¶ 87).

### F.    Typical EBT Transactions and Accompanying Shopping Patterns

Given the nature of the SNAP/EBT program, it is not uncommon for SNAP recipients to spend a great deal of their monthly allowances within only a few days of receiving a reload of SNAP benefits for the month.  (Ex. 1 at ¶ 88).  The USDA itself confirms that practice, recently advising in July 2019 that, "Low-income recipients of government assistance spend most, if not all, of the money they receive soon after receiving it."  USDA, Economic Research Service, https://www.ers.usda.gov/amber-waves/2019/july/quantifying-the-impact-of-snap-benefits-on-the-us-economy-and-jobs/? (July 2019).  This practice is no different than the average American doing his/her bulk grocery shopping on pay day.  When accepting SNAP/EBT benefits, it was not uncommon for Marathon to see a significant increase in purchases on select days of the month, with these purchases being larger than the average purchase.  (Ex. 1 at ¶ 89).  As attested by ▮▮▮▮, she almost always runs out of SNAP benefits before the end of the month.  (Ex. 12 at ¶¶ 18-19). When her SNAP benefits are replenished, her shopping increases significantly because she now has the funds to make food purchases.  (Ex. 12 at ¶ 19).

In addition, with EBT funds being a "free" government benefit, SNAP recipients tend to have different purchasing patterns with their EBT benefits than if they were using their own personal money at the store.  (Ex. 1 at ¶ 90).  By way of example, when accepting SNAP benefits,

Marathon Food Center sometimes would stock certain higher priced foods like frozen chicken wings (40 pounds for $40.00) and frozen butterfly shrimp (25 pounds for $44.00). (*Id*. at ¶ 91). Marathon rarely, if ever, offers these types of items currently, as its customers simply cannot afford and do not choose to spend this amount of their personal money on bulk chicken wings or shrimp. (*Id*. at ¶ 92). Spending the government's EBT funds, on the other hand, offered customers an opportunity to purchase more extravagant, higher-priced items that they otherwise could not afford. (*Id*. at ¶ 93).

### G. Marathon's Pricing Model and Inventory

Being a small family-run food center, Marathon does not subscribe to a sophisticated pricing structure or to marketing mechanisms that one may find at large supermarkets such as Kroger or Giant Eagle. (Ex. 1 at ¶ 94). A sophisticated pricing model and inventory management system does not apply to Marathon. (*Id*. at ¶ 95). Rather, Marathon prices its food to sell. (*Id*. at ¶ 96).

Most SNAP-eligible items at Marathon have prices ending in (i) 0 cents, (ii) 89 cents, or (iii) 99 cents. (*Id*. at ¶ 97). Some inventory may also end in 59 cents or 69 cents. (*Id*.). A select few items end in 49 cents. (*Id*.). There is nothing unusual about this pricing model, and several pricing combinations result in a total transaction price ending in 89 cents. (*Id*. at ¶ 98).

As explained by Araia in his response letter dated May 7, 2018, the following SNAP-eligible food items are just a few examples of some of Marathon's then-existing inventory:

- Large two-topping frozen specialty pizza for $9.89.
- Large three-topping frozen specialty pizza with free two-liter drink (special) for $11.89.
- Frozen chicken (10-pound bag) for $14.89.
- Frozen chicken (two 10-pound bags) for $19.89.
- Two gallons of milk with two family-size boxes of cereal (special) for $17.89.

(AR 112-113; Ex. 1 at ¶ 99).

Each of the above prices end in 89 cents.  (Ex. 1 at ¶ 100).  There is nothing "suspicious" about that.  (*Id*.).  Marathon would typically purchase its specialty pizzas from Dairy Fresh, now known as Lipari Foods.  (*Id*. at ¶ 101).  Frozen chicken would be purchased from distributors Atlantic Foods or Sysco, depending on sale prices.  (*Id*.).

In addition to the above pricing examples, Marathon Food Center carried the following SNAP-eligible food items within its inventory at various times throughout Defendant's review period (September 2017 – February 2018):

- 40-pound bag of chicken wings for $40.00 (Atlantic Foods or Sysco).
- 25-pound bag of butterfly shrimp for $44.00 (Atlantic Foods or Sysco).
- 24-pack of soft drinks (Pepsi products) for $12.00.
- Two large three-topping specialty frozen pizzas (special) for $20.00 (Dairy Fresh/Lipari Foods).
- Two dozen doughnuts for $10.00.
- 20-pound bag of frozen hot wings for $20.00 (Atlantic Foods or Sysco).
- Case of 10 Monster energy drinks for $29.89.
- Case of 12 Red Bull for $34.19.
- 12-pack of juice (Clear Fruit) for $19.89.
- Gallon of whole (Vitamin D) milk for $4.00.
- Coca-Cola six-pack for $5.00.
- Pop-Tarts for $1.00.
- Granola Bars for $1.00.
- Small can of Pringles for $1.00.
- Doritos (large bag):  two for $7.00.
- Munchies Snack Mix:  two for $5.00.
- Peanuts and small snack bags of chips:  two for $1.00 or 59 cents each.
- Fire Cracker pickled sausages:  two for $1.00.
- King Size candy bars:  two for $2.00.
- Packs of gum for $1.00.
- Small hostess or Little Debbie snacks for $1.00.
- 2-liter (Pepsi, Coca-Cola) for $2.00.
- 16-ounce drink (water, Pepsi, Coca-Cola) for $1.00.
- Cereal (depending on size and brand) for $2.89, $3.99, or $4.99.
- Sugar for $1.89.
- Packaged lunch meat (bologna, salami) for $.89.
- Candy bars for $.89 or $1.89.
- Bag of chips for $1.89 or $2.89.
- Wheat bread for $2.89.
- Regular bread for $1.89.

- Jug of juice for $2.89.

(Ex. 1 at ¶ 102).

The inventory at Marathon Food Center is turned over constantly, on an as-needed basis. (*Id*. at ¶ 103). Being a small family-run operation, the inventory is always changing, and in many cases is done "on the go," which Marathon has the liberty to do, as an independently run store, and has done for many years. (*Id*. at ¶ 104). Inventory, and particularly the higher priced food items like frozen chicken wings and frozen shrimp, are purchased and stocked by Marathon based upon pricing levels offered by the manufacturers and/or distributors. (*Id*. at ¶ 105). And of course, inventory levels depend on customer demand. (*Id*.). Certain higher priced groceries may be "in stock" for weeks at a time because they are repeatedly ordered to meet high demand. (*Id*. at ¶ 107). These same food items may be "out of stock" for weeks at a time as well. (*Id*.).

In sum, the shopping patterns of Marathon's customers primarily drive how and when Marathon stocks its inventory. (*Id*. at ¶ 108).

Marathon does not have a formal inventory management system, as it does not employ optical scanners or other sophisticated point-of-sale systems. (*Id*. at ¶ 109). Such sophisticated technology would be an unnecessary luxury in this immigrant-owned store. (*Id*.). Instead, Marathon uses a cash register from 2010 and does not have the capability to produce an itemized receipt, which has never been an issue for its customers and, therefore, not something Marathon deemed to be a necessary investment. (*Id*. at ¶ 110).

Because Marathon does not have electronic cash registers and/or optical scanners that automatically identify eligible and ineligible SNAP items, Marathon would always separate the SNAP eligible items from the ineligible items at time of purchase. (*Id*. at ¶ 111). This was all that was required of Marathon to accept SNAP benefits. *See* USDA SNAP Training Guide for

24

Retailers, https://fns-prod.azureedge.net/sites/default/files/media/file/Retailer-Training-Guide.pdf.  Notably, the federal rules governing the SNAP program do not require that SNAP retailers employ optical scanners or produce itemized receipts.  *Id*.

**H.** **The Government's Decision Based on Cherry-Picked Statistics and Unproven Speculated "Patterns"**

In Defendant's ALERT Case Analysis Document and subsequent Agency Decision, the federal government identified only three (3) isolated "patterns" of activity which Defendant claims are "more likely than not the result of trafficking."  (AR 89-92).[5]  Specifically, Defendant suggests the following activity at Marathon Food Center is suggestive of trafficking in SNAP benefits: (i) an unusual number of transactions ending in a same cents value; (ii) repetitive transactions in a set period of time by same household/account; and (iii) excessively large purchase transactions were made from recipient accounts.  (*Id*.).

Defendant further conducted a purported "analysis" of five (5) individual households by reviewing these households' SNAP transactions.  Consistent with the uneven playing field upon which these "investigations" are carried out, the government cherry-picked the five households having SNAP transactions most closely resembling those "patterns" allegedly identified by the ALERT system.  (AR 95-98).

Yet interestingly, the federal government made no attempt whatsoever to contact or otherwise investigate those five households identified as having allegedly participated in the alleged trafficking.  (*See* Exhibit A to Defendant's Motion for Summary Judgment at PAGEID 583).  Rather, as Defendant stated in its written discovery responses, "FNS does not investigate individual households.  Such investigations, if conducted, would be performed by the state that authorized the household to receive benefits."  (*Id*.)

---

[5] For brevity, Marathon will cite to the Administrative Record as "AR."

I.      **The Government's Lack of Any Investigatory Process and Its Haphazard Site Review**

Defendant conducted a review of Marathon's EBT transactions from September 2017 through February 2018, a six-month timeframe. (AR 85). It is unclear from the Administrative Record when the formal case analysis, or so-called investigation, commenced. (*See generally*, AR). A government contractor operating under the name of ISN Corporation conducted a site review of Marathon on March 27, 2018, through its employee Matthew Hanbaum ("Hanbaum"). (AR 16-20).

Present at the store during this review was Marathon Cashier Hamat. (Ex. 1 at ¶¶ 114-115; Ex. 4 at ¶ 6). Marathon's General Manager, Abner, was not present during the site visit. (*Id.*). Neither Marathon nor Hamat had any idea that the store was under a federal investigation for SNAP trafficking, nor did Marathon or Hamat have any inclination that any information compiled by Hanbaum would be used to build a case for trafficking against the store. (Ex. 1 at ¶ 116; Ex. 4 at ¶¶ 7-11).

Rather, and in what now appears to be a clandestine and unfair interview, Hanbaum, after identifying himself as working with the federal government, advised Hamat: "Don't worry. This is a standard process. We go to all the SNAP retail stores and take photos and walk through the food aisles." (Ex. 4 at ¶ 10).

Hanbaum then proceeded to walk around the store, by himself, taking photos. (Ex. 4 at ¶¶ 9, 11). Hamat did not accompany Hanbaum on this visit, as it was not done in collaboration with store personnel, as purportedly required by the reviewer. (Ex. 4 at ¶ 12; *see also* AR 16). Hanbaum's site review took less than thirty (30) minutes. (Ex. 4 at ¶ 13). While Hamat was assisting other store customers (the visit was right around the busy lunch hour), Hamat was casually asked if he could quickly identify the four (4) most expensive SNAP eligible items for

26

sale, along with their prices. (Ex. 4 at ¶ 14). Hamat was not given any instructions or qualifications surrounding the question, nor was he given much time to think about his response. (*Id*. at 16). Little did Hamat know that his response, which seemed so trivial at the time, would seal Marathon's fate in this one-sided and heavy-handed government "investigation." (*Id*. at ¶¶ 15-17). Not thinking anything of the casual inquiry, and while attending to the store's customers, Hamat attempted to name, off the "top of his head," what he thought might be some items falling into this category, including his best guess of their prices. (*Id*. at ¶ 15). Yet, as explained by Defendant in its ALERT Case Analysis Document, Hamat's off-the-cuff response with no reflection whatsoever specifically set the parameters under which Marathon's EBT transactions, specifically with respect to pricing, would be reviewed by Defendant. (AR 86).

In this vein, Hamat casually and quickly provided Hanbaum with the following products and corresponding prices:

- Coffee: $5.99;
- Frozen Shrimp: $14.99;
- Frozen Pizza: $7.49; and
- Infant Formula: $15.99.

(AR 17, 86; Ex. 4 at ¶ 18).

Hamat's responses captured on the site visit review form, however, are not indicative of Marathon's then-existing inventory and pricing, and they certainly are not representative of Marathon's inventory and pricing during the government's period of review between September 2017 and February 2018. (Ex. 1 at ¶¶ 117-120; Ex. 4 at ¶¶ 19-21). Hamat attests that he did not review the store's full inventory line during that visit to specifically answer the government contractor's question. (Ex. 4 at ¶ 19).

By way of one example, Marathon consistently offered for sale 24-packs of soft drinks for $12.00 each. (Ex. 1 at ¶ 118; Ex. 4 at ¶ 20). Hanbaum's photographs of the store taken during the

site review show cases of soft drinks for sale, yet this item was omitted from the list of "highest-priced" items offered for sale. (AR 25). Noticeably absent from most of Hanbaum's photographs is the corresponding pricing of each food item. (AR 23-43). As Hamat and Abner attest, at that time, there were numerous SNAP eligible items which had much higher prices than $5.99 and $7.49. (Ex. 1 at ¶ 119; Ex. 4 at ¶ 21).

Moreover, and consistent with Defendant's repeated decisions to selectively cherry-pick store data based upon what supports the government's speculation and conclusory allegations, Defendant gave no consideration whatsoever to the purchase of higher-priced infant formula, blindly asserting that, "High amounts of formula would unlikely be something purchased routinely with SNAP benefits." (AR 86).

As detailed above and attested by Abner and Hamat, throughout the government's review period, Marathon carried many other SNAP eligible items having much higher prices than indicated in the site review. (Ex. 1 at ¶ 119; Ex. 4 at ¶ 21). Therefore, as a threshold matter, Defendant's defined parameters for concluding that some of Marathon's transactions are "excessively large" are based on inaccurate prices obtained in a 30-minute walk-through by a government contractor. (Ex. 1 at ¶ 120).

In sum, the question posed to Hamat did not disclose the impact of his answer which was subsequently used by the government to establish a lower threshold by which to, inaccurately, evaluate the Marathon store. (Ex. 4 at ¶¶ 14-15). Had Hamat known his answer was being used for such important decisions, he would have called his General Manager, or at least given the question his full, undivided attention. (*Id*. at ¶ 17).

By way of letter dated April 30, 2018, Defendant, through FNS, issued a Charge Letter finding that Marathon engaged in "clear and repetitive patterns of unusual, irregular, and

28

inexplicable activity" for its type of business.  (AR 100-102).  Marathon was given a mere ten (10) calendar days to respond.  (*Id*.).

Through written correspondence dated May 7, 2018, Marathon timely responded, pro se and without counsel.  (AR 112-113).  Marathon responded to the government's speculatory assertions, explaining in part as follows:

- Marathon employees are well trained.

- Marathon is the only store "around here" open 24 hours per day, thus attracting lots of customers from far and wide.

- In September 2017, a nearby store closed, adding to the number of customers served by Marathon.

- Some customers do purchase large amounts of groceries with EBT cards, and Marathon does not limit their purchases.

(AR 112-113).

In its response, Marathon also provided several examples of SNAP-eligible food items ending in 89 cents.  (*Id*.).

In Defendant's "Retailer Reply and Case Sanction Recommendation," the government gave short shrift to Marathon's response, again relying on its own speculations and conclusory allegations to reject the store's appeal.  (AR 114-120).

For example, the nearby store which closed its doors in or around September 2017 was a Shop 'n Save supermarket.  (Ex. 1 at ¶¶ 186-188; Ex. 15).  Defendant states that it reviewed its records for disqualifications or withdrawals and could not locate any in 2017.  (AR 116).  Defendant's response and purported "investigation" is irresponsible.  (*Id*.).  As easy as it was to send a contractor for a site visit, Defendant could have sent the same contractor to verify the business operations of the shuttered supermarket, which is literally within 0.1 mile of Marathon.

29

Indeed, it is highly likely that the store ceased operations without notifying the federal government it was no longer in business. From the FNS website:

> Contact FNS at 1-877-823-4369, if:
>
> - If your store closes,
> - If there is a change or [sic] owners, or
> - If there is a change in the store address or telephone number.
>
> You MUST apply for a separate SNAP permit for each store location you own.

*See* USDA, Food & Nutrition Serv. (updated March 3, 2020), https://www.fns.usda.gov/snap-retailer-authorization.

In this vein, if a SNAP retailer ceases operations, notifying the federal government of its closure is likely not the highest priority for the store. There is simply no need, as it likely would be a time-intensive process for which the shuttered store would reap no benefit.

With respect to Marathon's suggested pricing and the purchasing habits of its customers, Defendant again brushes Marathon's evidence aside, blindly asserting that the site visit does not show any deals or prices ending in 89 cents. (AR ). Notably, a review of the contractor visit photos shows that only minimal photographs were taken of store pricing. (AR 23-43).

## IV. **LAW AND ARGUMENT**

### A. **Summary Judgment Standard Generally**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

To show that a fact cannot be genuinely disputed, a party must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other matter." Fed. R. Civ. P. 56(c)(1). The movant may also show "that an adverse party cannot produce admissible evidence to support the fact." *Id*.

"The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

While the movant has the burden of first showing there is no genuine issue of material fact, the non-moving party "is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256. Thus, once the movant has demonstrated the absence of any genuine issues of material fact, the burden shifts to the nonmoving party to show that summary judgment should not be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986).

The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986). The "mere existence of a scintilla of evidence" in opposition to the motion is insufficient to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 252 (1986); *see also Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996). Rather, the non-moving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *St. v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989).

As demonstrated herein and through the attached declaration and exhibits, Defendant's Motion for Summary Judgment should be denied, and Marathon's Cross-Motion should be granted as a matter of law.

### B. Judicial De Novo Review of a SNAP Disqualification

Under the SNAP statute, the district court shall conduct a "trial de novo" to "determine the validity of the questioned administrative action."  7 U.S.C. § 2023(a)(15).  Although the Court's de novo review is limited to determining the validity of the administrative action, the Court is not restricted to examining the administrative record.  *Warren v. United States,* 932 F.2d 582, 586 (6th Cir. 1991).  Rather, "a district court is to make its own findings based upon the preponderance of the evidence and not limit itself to matters considered in the administrative proceeding."  *Id.*, citing *Saunders v. United States*, 507 F.2d 33, 36 (6th Cir. 1974).

While the district court is not "bound by the administrative record," the agency's decision is presumed to be valid and must stand "unless the plaintiff proves that it should be set aside."  *Redmond,* 507 F.2d at 1011–12; *see also McCray v. United States,* 511 F.Supp. 205, 209 (E.D.Mich.1981).  "Juxtaposing this substantive standard with ordinary summary judgment principles, plaintiff may withstand defendant's motion for summary judgment by raising material issues of fact as to the violations charged against' the plaintiff."  *Hanna,* No. 04–74627, 2007 WL 1016988, at *4 (citing *Kahin v. United States,* 101 F.Supp.2d 1299, 1303 (S.D.Cal.2000)).

Importantly, with a trial de novo, the "existence of a violation is examined afresh."  *Kim v. United States,* 121 F.3d 1269, 1274 (9th Cir. 1997).  A trial de novo effectively provides the aggrieved food store with a new trial where the store may introduce evidence outside the administrative record.  *Redmond v. United States,* 507 F.2d 1007, 1011-1012 (5th Cir. 1975).

### C. Evidentiary Requirements in SNAP Disqualification Cases

"To survive summary judgment, a plaintiff in a Food Stamp Program disqualification case must raise material issues of fact as to *each* alleged violation."  *McClain's Mkt. v. United States*, 214 Fed.Appx. 502, 505 (6th Cir.2006) (*citation omitted*; *emphasis in original*).  In *McClain's*

*Mkt*, the Sixth Circuit noted that the plaintiff "does not directly explain any of the 149 unusual transactions noted by FNS, any one of which is sufficient to establish a violation." *Id*.

The Sixth Circuit further explained the evidentiary requirements in SNAP disqualification cases as follows:

> Take the district court's conclusion regarding multiple transactions by a single beneficiary within a short period of time. In crediting plaintiffs' argument "that it would be possible for someone to come into the store, make a purchase, then give his card to someone else to make a purchase," the district court noted that "this explanation could account for *some* of the suspicious transactions. But this explanation fails to account for *all* of the suspicious transactions." (Emphasis added.) The district court then highlighted two particularly problematic and unexplained transactions of $63.49 and $107.94 in less than two minutes on the same account. Plaintiffs make no rebuttal to these transactions on appeal, and instead focus on other transactions that occurred between thirty minutes and six hours apart. From these, they contend "one could conclude that eligible food sales occurred as opposed to trafficking SNAP benefits." One could conclude this. But that is not the standard—it was their burden to raise material issues of fact as to *each* alleged violation, and having failed to do so, summary judgment was warranted.

*Ganesh v. United States*, 658 Fed.Appx. 217, 221 (6th Cir.2016).

As noted above, the Court's review is "not limited to the administrative record" and Marathon "may offer any relevant evidence available to support [its] case, whether or not it has been previously submitted to the agency." *Skyson USA, LLC v. United States*, D.Haw. No. 09-00278 BMK, 2010 U.S. Dist. LEXIS 15108, at *12-13 (Feb. 22, 2010), *citing Kim,* 121 F.3d at 1272.

In *Skyson*, the district court reviewed a SNAP disqualification decision involving nearly identical shopping "patterns" driving the government's decision, as is the case here:   (i) transactions ending in the same cents value; (ii) multiple transactions in short time frames; (iii) benefits exhausted in short time frames; and (iv) excessively large purchases.  *Id*.

The *Skyson* Court reversed the agency decision, holding that a preponderance of the evidence showed that the disqualified SNAP retailer did not engage in SNAP trafficking based upon the rebuttal evidence offered by the plaintiff retailer. *Id*.

Similarly, in a decision issued July 15, 2020, the district court in New Mexico denied the federal government's motion for summary judgment based upon the evidence submitted in response to the government's ALERT analysis. *See Four Winds Behavioral Health v. United States*, D.N.M. No. 19-212 SCY/LF, 2020 U.S. Dist. LEXIS 124534, at *20 (July 15, 2020).

In reviewing a SNAP disqualification decision, cases emanating from the Sixth Circuit provide that the government can take a general approach based on speculation and innuendo, but the SNAP retail store must be specific in offering detailed evidence concerning each and every identified transaction. *See, e.g., McClain's Mkt.*, 214 Fed.Appx. at 505; *Ganesh*, 658 Fed.Appx. at 221; *Skyson USA, LLC*, U.S. at *12-13. As detailed above, however, the SNAP regulations do not require that authorized retailers utilize optical scanners or other technological systems that can itemize or otherwise store the specific items purchased in each transaction.

Consequently, without a requirement that the SNAP retail store must maintain transactional data and/or a specific itemized transaction history of every single EBT transaction, the store is limited in its ability to specifically rebut the identified purchases, other than offering its own testimony and data in conjunction with the "patterns" and general purchasing practices such as those offered by the government.

Still, Abner nonetheless can attest to the bona fide transactions and herein rebuts each and every transaction identified by the government as "trafficking," as required by judicial precedent, and such to create an issue of material fact. Indeed, the evidence submitted herein by Marathon

cannot be specifically rebutted by Defendant, and Marathon therefore respectfully submits that it is entitled to judgment as a matter of law, reversing the agency decision.

Notably, the cases in this judicial district involve responses wherein the disqualified retailer offered only general and vague denials of SNAP trafficking, or the retailer otherwise did not directly rebut all transactions identified in the government's report. *McClain's Mkt.*, 214 Fed.Appx. at 505; *Ganesh*, 658 Fed.Appx. at 221.

Here, and to the contrary, Marathon specifically rebuts each and every transaction identified by Defendant as "trafficking," thus meeting the evidentiary requirements imposed by the Sixth Circuit and other courts. Not only should Defendant's Motion for Summary Judgment be denied, but Marathon Food Center is entitled to judgment reversing the Agency Decision.

### D.      Marathon Did Not Engage in Any Instances of Trafficking

Defendant alleges that Marathon sold or exchanged SNAP benefits in exchange for cash or other consideration other than eligible food, in violation of 7 C.F.R. §271.2.

In Defendant's ALERT Case Analysis and subsequent Agency Decision, the federal government identified only three (3) isolated "patterns" of activity which Defendant claims are "more likely than not the result of trafficking." (AR 89-92). Specifically, Defendant suggests the following activity at Marathon Food Center is suggestive of trafficking in SNAP benefits: (i) an unusual number of transactions ending in a same cents value; (ii) repetitive transactions in a set period of time by same household/account; and (iii) excessively large purchase transactions were made from recipient accounts. (*Id*).

Defendant further conducted a purported "analysis" of five (5) individual households by reviewing these households' SNAP transactions. (AR 95-98). Consistent with the uneven playing field upon which these "investigations" are carried out, the government cherry-picked the five

households having SNAP transactions most closely resembling those "patterns" allegedly identified by the ALERT system.

        1.     <u>An Unusual Number of Transactions Ending in a Same Cents Value</u>

Defendant takes issue with the fact that a certain number of Marathon's transactions over a 6-month review period ends in 89 cents. In fact, Defendant argues that a mere ███ of transactions of $9.00 or more ended in 89 cents, which must mean that Marathon is "trafficking" in SNAP benefits. (AR 89-90).

In its investigation, Defendant reviewed ███ EBT transactions, of which an alleged ███ transactions were at or above $9.00. (AR 89). Of those ███ transactions, an alleged ███ (only ███) ended in 89 cents. (*Id*.). Defendant argues that this suggests a pattern, and that "it appears that these transaction amounts are contrived and therefore, in the absence of any compelling rationale to the contrary, are indicative of trafficking." (AR 89).

This is a perfect example of Defendant's arbitrary and intentional manipulation of the evidence to try to support its conclusion. First, there is nothing in the Administrative Record to explain the government's decision to review only those transactions at or above $9.00. (AR 89).

Second, in speculating that Marathon has an abnormally "high" number of transactions ending in 89 cents, Defendant only reviewed ███ of Defendant's total SNAP transactions ███ of ███ transactions). This minimal sample size does not pass statistical muster.

Yet, according to Defendant, when a cashier enters a total price that ends in 89 cents too many times for the government's liking, that cashier has broken the law. The fallacy of that type of logic is glaring. Simply put, there is nothing illegal about ending a transaction in 89 cents, and Defendant has not offered a scintilla of evidence that any of those transactions actually consist of Marathon paying cash to the customer in exchange for the SNAP transactions.

Finally, a review of Attachment 1 in the ALERT Case Analysis Document shows each and every one of these "flagged" transactions to be entirely consistent with Marathon's pricing model. Marathon therefore submits evidentiary support to rebut each of these flagged transactions, as required by judicial precedent.  *See, e.g., McClain's Mkt.*, 214 Fed.Appx. at 505; *Ganesh*, 658 Fed.Appx. at 221.

Marathon's General Manager, Abner, attests through his sworn Declaration that he has never engaged in trafficking SNAP benefits and neither did his employees.  (Ex. 1 at ¶¶ 122-125). Marathon's employees also attest to this fact, under penalty of perjury.  (Ex. 4 at ¶ 4; Ex. 5 at ¶ 4). Abner also attests through his sworn Declaration that he reviewed each and every flagged transaction, and affirmatively attests that each transaction was a bona fide SNAP eligible purchase, as required by *McClain's Mkt* and *Ganesh*, *supra*.  (Ex. 1 at ¶ 128).

Specifically, Abner has thoroughly reviewed, in great detail, all transactions identified by the federal government which Defendant suggests is "trafficking" in SNAP benefits.  (Ex. 1 at ¶ 121).  What follows is Abner's sworn declaration concerning each and every "89 cent transaction," as set forth in Abner's sworn Declaration at Exhibit 1, Paragraphs 129 through 153.

Of the ▮ flagged transactions, twenty-five (25) of them represent separate charges of $9.89.  These charges do not represent trafficking.  Rather, each and every one of these transactions was a bona fide purchase of SNAP eligible items, such as:

- A frozen pizza for $9.89 (one of Marathon's more popular selling items); or
- A gallon of whole milk ($4.00), a box of cereal ($3.89), and a 2-liter soft drink ($2.00).

Five (5) of the flagged transactions represent separate charges of $10.89.  These charges do not represent trafficking.  Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- A frozen pizza ($9.89) plus a 16-ounce soft drink ($1.00); or

37

- A gallon of whole milk ($4.00), a box of cereal ($3.89), a 2-liter soft drink ($2.00), and a Pop-Tart ($1.00).

Twelve (12) of the flagged transactions represent separate charges of $11.89.  These charges do not represent trafficking.  Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- A frozen pizza ($9.89) plus a 2-liter soft drink ($2.00); or
- A gallon of whole milk ($4.00), a box of cereal ($3.89), and two 2-liter soft drinks ($4.00); or
- A gallon of whole milk ($4.00), a box of cereal ($3.89), a 2-liter soft drink ($2.00), a Pop-Tart ($1.00); and a granola bar ($1.00).

Six (6) of the flagged transactions represent separate charges of $12.89.  These charges do not represent trafficking.  Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- A frozen pizza ($9.89), a 2-liter soft drink ($2.00), and a small Hostess snack ($1.00); or
- A gallon of whole milk ($4.00), a box of cereal ($3.89), two 2-liter soft drinks ($4.00), and a granola bar ($1.00); or
- A gallon of whole milk ($4.00), a box of cereal ($3.89), a 2-liter soft drink ($2.00), a Pop-Tart ($1.00); and two granola bars ($2.00).

Four (4) of the flagged transactions represent separate charges of $13.89.  These charges do not represent trafficking.  Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- Two large bags of Doritos ($7.00), two bags of Munchies Snack Mix ($5.00), and a bag of chips ($1.89); or
- A gallon of whole milk ($4.00), two large bags of Doritos ($7.00), and a loaf of wheat bread ($2.89); or
- A gallon of whole milk ($4.00), a box of cereal ($3.89), a 2-liter soft drink ($2.00), two Pop-Tarts ($2.00); and two granola bars ($2.00).

Seven (7) of the flagged transactions represent separate charges of $14.89.  These charges do not represent trafficking.  Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- A frozen pizza ($9.89), a gallon of whole milk ($4.00); and a granola bar ($1.00); or
- Two large bags of Doritos ($7.00), two bags of Munchies Snack Mix ($5.00), a bag of chips ($1.89), and a 16-ounce soft drink ($1.00); or
- A gallon of whole milk ($4.00), two large bags of Doritos ($7.00), a loaf of wheat bread ($2.89), and two small bags of chips ($1.00).

Two (2) of the flagged transactions represent separate charges of $15.89. These charges do not represent trafficking. Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- A frozen pizza ($9.89), two 2-liter soft drinks ($4.00), and two king size candy bars ($2.00); or
- A gallon of whole milk ($4.00), two large bags of Doritos ($7.00), cereal ($3.89), and a small can of Pringles ($1.00).

Eleven (11) of the flagged transactions represent separate charges of $16.89. These charges do not represent trafficking. Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- Frozen chicken (10-pound bag) for $14.89 plus two king size candy bars ($2.00); or
- A gallon of whole milk ($4.00), two large bags of Doritos ($7.00), two bags of Munchies Snack Mix ($5.00), and a candy bar ($.89).

Five (5) of the flagged transactions represent separate charges of $17.89. These charges do not represent trafficking. Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- Frozen chicken (10-pound bag) for $14.89, two king size candy bars ($2.00), and a 16-ounce soft drink ($1.00); or
- A gallon of whole milk ($4.00), two large bags of Doritos ($7.00), two bags of Munchies Snack Mix ($5.00), a candy bar ($.89), and a Little Debbie snack cake ($1.00).

Four (4) of the flagged transactions represent separate charges of $18.89. These charges do not represent trafficking. Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- A frozen pizza ($9.89), two large bags of Doritos ($7.00), and two king size candy bars ($2.00); or
- Frozen chicken (10-pound bag) for $14.89, two king size candy bars ($2.00), and a 2-liter soft drink ($2.00); or
- A gallon of whole milk ($4.00), two large bags of Doritos ($7.00), two bags of Munchies Snack Mix ($5.00), a candy bar ($.89), and two Little Debbie snack cakes ($2.00).

Five (5) of the flagged transactions represent separate charges of $19.89.  These charges do not represent trafficking.  Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- Two gallons of milk with two family-size boxes of cereal (special for $17.89), plus two granola bars ($2.00); or
- A frozen pizza ($9.89), two large bags of Doritos ($7.00), a Little Debbie snack cake ($1.00), and two king size candy bars ($2.00); or
- 12-pack of juice (Clear Fruit) for $19.89.

One (1) of the flagged transactions represents a charge of $20.89.  This charge does not represent trafficking.  Rather, this charge was a bona fide purchase of SNAP eligible items, such as:

- Two gallons of milk with two family-size boxes of cereal (special for $17.89) plus two granola bars ($2.00), plus two bags of chips ($1.00).

Three (3) of the flagged transactions represent separate charges of $22.89.  These charges do not represent trafficking.  Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- 20-pound bag of frozen hot wings ($20.00) plus two king size candy bars ($2.89); or
- Two large three-topping frozen pizzas ($20.00) plus cereal ($2.89).

One (1) of the flagged transactions represents a charge of $23.89.  This charge does not represent trafficking.  Rather, this charge was a bona fide purchase of SNAP eligible items, such as:

- Two gallons of milk with two family-size boxes of cereal (special for $17.89), two granola bars ($2.00), and two bags of chips ($1.00), two small cans of Pringles ($2.00), and a Little Debbie snack cake ($1.00).

Three (3) of the flagged transactions represent separate charges of $24.89.  These charges do not represent trafficking.  Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- 20-pound bag of frozen hot wings ($20.00), two king size candy bars ($2.89), and two granola bars ($2.00); or
- Two large three-topping frozen pizzas ($20.00), cereal ($2.89), and a 2-liter ($2.00).

Three (3) of the flagged transactions represent separate charges of $26.89.  These charges do not represent trafficking.  Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- 20-pound bag of frozen hot wings ($20.00), two king size candy bars ($2.89), two granola bars ($2.00), and a 2-liter ($2.00);
- Two large three-topping frozen pizzas ($20.00), cereal ($2.89), a 2-liter ($2.00), and two king size candy bars ($2.00); or
- Two gallons of milk with two family-size boxes of cereal (special for $17.89), two bags of chips ($1.00), two small cans of Pringles ($2.00), two large bags of Munchies Snack Mix ($5.00); and a Little Debbie snack cake ($1.00).

One (1) of the flagged transactions represents a charge of $28.89.  This charge does not represent trafficking.  Rather, this charge was a bona fide purchase of SNAP eligible items, such as:

- Two gallons of milk with two family-size boxes of cereal (special for $17.89), two granola bars ($2.00), two bags of chips ($1.00), two small cans of Pringles ($2.00), two large bags of Munchies Snack Mix ($5.00); and a Little Debbie snack cake ($1.00).

Three (3) of the flagged transactions represent separate charges of $29.89.  These charges do not represent trafficking.  Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- 20-pound bag of frozen hot wings ($20.00), two large bags of Doritos ($7.00), and two king size candy bars ($2.89); or

41

- A case of Monster Energy drinks ($29.89).

One (1) of the flagged transactions represents a charge of $32.89.  This charge does not represent trafficking.  Rather, this charge was a bona fide purchase of SNAP eligible items, such as:

- Frozen chicken (two 10-pound bags for $19.89), two large bags of Doritos ($7.00), two bags of Munchies Snack Mix ($5.00), and a Little Debbie snack cake ($1.00).

One (1) of the flagged transactions represents a charge of $34.89.  This charge does not represent trafficking.  Rather, this charge was a bona fide purchase of SNAP eligible items, such as:

- Frozen chicken (two 10-pound bags for $19.89), two large bags of Doritos ($7.00), two bags of Munchies Snack Mix ($5.00), two king size candy bars ($2.00), and a Little Debbie snack cake ($1.00).

Two (2) of the flagged transactions represent separate charges of $37.89.  These charges do not represent trafficking.  Rather, each and every one of them was a bona fide purchase of SNAP eligible items, such as:

- 20-pound bag of frozen hot wings ($20.00), two large bags of Doritos ($7.00), two gallons of whole milk ($8.00), and two king size candy bars ($2.89); or
- A case of Monster Energy drinks ($29.89), two large bags of Doritos ($7.00), and a granola bar ($1.00).

One (1) of the flagged transactions represents a charge of $38.89.  This charge does not represent trafficking.  Rather, this charge was a bona fide purchase of SNAP eligible items, such as:

- Twenty-pound bag of frozen hot wings ($20.00), two large bags of Doritos ($7.00), two bags of Munchies Snack Mix ($5.00), loaf of wheat bread ($2.89), two king size candy bars ($2.00), a granola bar ($1.00), and a Little Debbie snack cake ($1.00).

(Ex. 1 at ¶¶ 129-153).

In addition, several 89 cent transactions identified by Defendant in its analysis were conducted by SNAP recipients who affirmatively attest that they have only used SNAP benefits at Marathon Food Center for SNAP eligible items.  (Affidavits of ███████████████████ ████████████████, attached respectively as Exhibits 8, 9, 10, and 11).  Affiants also attest that they have never misused SNAP benefits or purchased non-eligible items at Marathon. (*Id*.)

Specifically, the Affiants and related transactions are shown below:

- ████████████, Household ****0999:  One 89 cent transaction of $10.89.  (Ex. 8 at ¶¶ 3-6).

- ████████████, Household ***4499:  One 89 cent transaction of $28.89.  (Ex. 9 at ¶¶ 4-6).

- █████████, Household ***4699:  Four 89 cent transactions of $22.89, $16.89, $16.89, and $9.89.  (Ex. 10 at ¶¶ 4-6).

- ███████████, Household ****5499:  Three 89 cent transactions of $20.89, $16.89, and $11.89.  (Ex. 11 at ¶¶ 4-6).

Marathon acknowledges that due to the lack of an itemized transaction or receipt and due to the passage of time, these Affiants could not possibly attest to what they specifically purchased from Marathon on a particular date occurring nearly three years prior.  Most people cannot recall what they purchased at the grocery store last week, let alone nearly three years ago.  Nonetheless, these Affiants affirmatively attest, under penalty of perjury, that their corresponding SNAP benefits were never misused and that they only purchased SNAP eligible items with SNAP benefits at Marathon Food Center.  This satisfies Marathon's evidentiary burden in rebutting the specific transactions at issue here.

In sum, a mere ████ of EBT transactions ending in 89 cents is not unusual at all.  Moreover, Marathon's inventory and pricing levels detailed above easily give rise to transactions ending in

89 cents.  Some of Marathon's most popular food items end in 89 cents (i.e. frozen pizza, candy bars, bags of chips, bread, juice, and frozen chicken).

In *Skyson, supra*, the SNAP retailer attested that many of the store's food items end in 98 cents (the number questioned by the government's review) and that some items end in zero cents and 99 cents.  *Skyson USA, LLC v. United States*, D.Haw. No. 09-00278 BMK, 2010 U.S. Dist. LEXIS 15108, at *21-22 (Feb. 22, 2010).  The *Skyson* court reversed the agency decision, holding that the plaintiff "adequately explains why a number of transactions ended in 98 cents and provides evidence in support thereof."  *Id*. at *24.  The court in *Skyson* further held that, "Given [plaintiff's] pricing model, these transactions are not 'unusual, irregular, and inexplicable.'"  *Id*.

Of note in *Skyson*, the government had identified one-third of reviewed transactions as ending in the same cents value.  In this case, to the contrary, the government has identified a mere ▆▆▆ of transactions ending in the same cents value.

Similarly, in *Four Winds, supra*, the government's motion for summary judgment was denied based upon the plaintiff's evidence showing that the SNAP retailer primarily used same-cents pricing.  *Four Winds Behavioral Health*, 2020 U.S. Dist. LEXIS 124534, at *32 (July 15, 2020).  Of note in *Four Winds* is the government's identification of 64% of transactions over $9.00 ending in the same cents, as compared to a mere ▆▆▆ of Marathon's transactions at or above $9.00 ending in the same cents.

This case is no different than *Skyson* and *Four Winds* and demands the same result as in *Skyson*.  The Agency Decision should be reversed.

In the case at hand, Marathon affirmatively attests that each and every transaction identified in Defendant's Attachment 1 was for a SNAP-eligible item and did not involve any trafficking whatsoever of SNAP benefits.

2.    Repetitive Transactions in a Set Period of Time by the Same Household/Account

Defendant's second suggestion of trafficking (Attachment 2), without any support, is that "multiple withdrawals were made from the account of a single SNAP household within a set time period." (AR 90). Between September 2017 and February 2018, Marathon allegedly engaged in a mere 13 sets of violations by 8 different households, totaling 46 "flagged transactions." (*Id*.). Defendant speculates that trafficking has occurred based upon the "short" timeframe between transactions and because some of the successive transactions exceed any "nominal, afterthought purchase." (*Id*)

Marathon's General Manager, Abner, attests through his sworn declaration that he has not engaged in trafficking SNAP benefits and neither did his employees. (Ex. 1 at ¶¶ 122-125). Marathon's employees also attest to this fact, under penalty of perjury. (Ex. 4 at ¶ 4; Ex. 5 at ¶ 4). As detailed above, it is not unusual for Marathon to process multiple transactions for a particular customer in a short time frame, even within minutes. (Ex. 1 at ¶ 157). Other store customers who utilize SNAP benefits also attest to this fact personally. (Exs. 12, 13, 14). Furthermore, having been involved with the management of Marathon since 2002, Abner is able to operate the cash register very quickly. (Ex. 1 at ¶¶ 156-157). Abner attests that he can handle as many as five customers or transactions in 1-2 minutes, and sometimes in less than a single minute. (Ex. 1 at ¶ 157).

As noted above, Marathon Food Center does not use an optical scanner. (*Id*. at 158). Rather, it uses an older-type cash register from 2010. (*Id*.). For EBT-eligible purchases, the cash register contained a button labelled "EBT." (Ex. 1 at ¶ 159). Being responsible for the entire Marathon operation, including inventory management and pricing, Abner knows the price of every single product in his store without needing to look at a price tag. (*Id*. at ¶ 160). When customers

are in the store, Abner spends his time behind the counter at the cash register.  (*Id*. at ¶ 161).  For efficiency purposes and to keep things moving, and especially so that his customers are not waiting in line or otherwise congregating at the front of the store, Abner will start to ring up a purchase transaction as a customer approaches the counter.  (*Id*. at ¶ 162).  In the absence of carts or baskets, Abner can easily see what a customer is purchasing, hence he can begin to enter the transaction. (*Id*. at ¶ 163).  Based upon his level of experience with the cash register and with inventory management, Abner can process transactions in rapid succession.  (*Id*. at ¶ 166).  For each eligible grocery item, when Marathon was accepting SNAP/EBT benefits, Abner would tap the "EBT button" on the register and enter the price, which he has committed to memory.  (*Id*. at ¶ 164). Entering a single food item in the register takes all of 3-5 seconds.  (*Id*. at ¶ 165).  For this reason, transactions at Marathon can be conducted in rapid succession.  (*Id*. at ¶ 166).  Because Marathon does not utilize a sophisticated inventory management or point-of-sale system such as an optical scanner, Marathon's process was to separate SNAP eligible items from SNAP ineligible items if a customer is purchasing both types of goods.  (*Id*. at ¶ 167).

As cited and referenced above, Marathon customers must often make multiple trips to the cash register, as they can only carry so much in their hands. (Ex. 1 at ¶ 60).  The transactions are typically entered separately so as to keep the process moving.  (*Id*. at ¶ 70).  Further, when family members are shopping together, they often are not finished choosing their groceries at the same time.  (*Id*. at ¶ 68).  When the customer places the first set of groceries on the counter, Abner would quickly make the sale and conduct the EBT transaction.  (*Id*. at ¶¶ 70-73).  The customer or a family member may then carry a second set of groceries to the counter, and the process repeats. (Ex. 1 at ¶ 70).  The store is not very large, thus a customer can easily make a trip back to the

register in a minute or two, as the customer will typically already know what will be purchased next.  (*Id*. at ¶ 168).

In addition, SNAP recipients often visited Marathon with family members.  (*Id*. at ¶ 169).  Each family member or friend may choose different items to purchase, thus resulting in multiple transactions in rapid succession.  (*Id*. at ¶ 170).  In this case, the transactions may even be within seconds.  (*Id*.).  The same process applies, whereby Abner will complete the transaction and the first family member will take his/her groceries.  (*Id*. at ¶ 171).  The second family member will then conduct his/her transaction in the same way.  (*Id*.).

With respect to Defendant's suggestion that the subsequent transactions are too "large" such that they infer trafficking, these transaction amounts fit entirely within Marathon's pricing structure, as detailed more fully above.  (*Id*. at ¶ 172).  Marathon therefore submits evidentiary support to rebut each and every one of these flagged transactions, consistent with judicial precedent requiring it to do so.  *See, e.g., McClain's Mkt.*, 214 Fed.Appx. at 505; *Ganesh*, 658 Fed.Appx. at 221.

Specifically, Abner has thoroughly reviewed, in great detail, all transactions identified by the federal government which Defendant suggests is "trafficking" in SNAP benefits.  (Ex. 1 at ¶ 121).  What follows is Abner's sworn declarations concerning each and every "repetitive transaction," as set forth in Abner's sworn Declaration at Exhibit 1, Paragraphs 173-185.

Flagged Transactions 110-111:

These transactions do not represent trafficking.  Rather, both of these transactions were the result of the SNAP household making two separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together.  Both

47

of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following for the two transactions:

- Two dozen doughnuts ($10.00), two gallons of milk with two family-size boxes of cereal (special for $17.89), case of 12 Red Bull (Transaction 111) ($34.19), two loaves of wheat bread ($5.78), two jugs of juice ($5.78), two packaged lunch meat bologna ($1.78), two packaged lunch meat salami ($1.78).

Flagged Transactions 112-114:

These transactions do not represent trafficking. Rather, all of these transactions were the result of the SNAP household needing to make three separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following for the two transactions:

- Frozen chicken (two ten-pound bags) ($19.89), two large three-topping specialty frozen pizzas (special) ($20.00), 12-pack of juice clear fruit ($19.89), Doritos large bag (two for $7.00), case of 10 Monster energy drinks ($29.89), two gallons of whole vitamin D milk ($8.00), and two-dozen doughnuts ($10.00).

Flagged Transactions 115-117:

These transactions do not represent trafficking. Rather, all of these transactions were the result of the SNAP household needing to make three separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following for the two transactions:

- Three boxes of cereal ($14.97), three gallons of whole milk ($12.00), 12-pack of juice clear fruit ($19.89), six Pop-Tarts ($6.00), six granola bars ($6.00), three loaves of wheat bread ($8.67), Munchies Snack Mix (two for $5.00), and a case of 10 Monster energy drinks ($29.89).

Flagged Transactions 118-120:

These transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make three separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Case of 10 Monster energy drinks ($29.89), Doritos large bag (four for $14.00), Coca-Cola 24-pack ($12.00), Munchies Snack Mix (four for $10.00), ten small hostess snacks ($10.00), five small cans of Pringles ($5.00), several bags of chips ($2.89 each), and two dozen doughnuts ($10.00).

Flagged Transactions 121-123:

These transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make three separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Case of 10 Monster energy drinks ($29.89), Doritos large bag (four for $14.00), Coca-Cola 24-pack ($12.00), Munchies Snack Mix (four for $10.00), ten small hostess snacks ($10.00), five small cans of Pringles ($5.00), several bags of chips ($2.89 each), and two dozen doughnuts ($10.00).

Flagged Transactions 124-126:

These transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make three separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following for the two transactions:

- Two large three-topping specialty frozen pizzas special ($20.00), two large two-topping frozen specialty pizza ($19.78), Doritos large bag (two for $7.00), two Coca-Cola six-packs ($10.00), king size candy bars (four for $4.00), frozen chicken (four ten-pound bags) ($39.78), and 4 bags of chips ($11.56).

Flagged Transactions 127-130:

These transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make four separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Three boxes of cereal ($14.97), three gallons of whole milk ($12.00), 12-pack of juice clear fruit ($19.89), six Pop-Tarts ($6.00), six granola bars ($6.00), three loaves of wheat bread ($8.67), Munchies Snack Mix (two for $5.00), and a case of 10 Monster energy drinks ($29.89).

Flagged Transactions 131-133:

These transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make three separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following for the two transactions:

- 20-pound bag of frozen hot wings ($20.00), frozen chicken 10-pound bag ($14.89), case of 12 Red Bull ($34.19), Doritos large bag (four for $14.00), large three-topping frozen specialty pizza with free two-liter drink special ($11.89), gallon of whole milk ($4.00), and four small cans of Pringles ($4.00).

Flagged Transactions 134-138:

These transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make five separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together.

All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Two dozen doughnuts ($10.00), three large three-topping frozen specialty pizzas with free two-liter drink (special) ($35.67), case of 10 Monster energy drinks ($29.89), 4 frozen dinner meals ($24.00), two Coca-Cola six-packs ($10.00), 5 Pop-Tarts ($5.00), Doritos large bag (four for $14.00), three 2-liters ($6.00), Munchies Snack Mix (four for $10.00), two gallons of whole milk ($8.00), and two large three-topping specialty frozen pizzas (special) ($20.00).

Flagged Transactions 139-142:

These transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make four separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Three boxes of cereal ($14.97), three gallons of whole milk ($12.00), 12-pack of juice clear fruit ($19.89), six Pop-Tarts ($6.00), six granola bars ($6.00), three loaves of wheat bread ($8.67), Munchies Snack Mix (two for $5.00), a case of 10 Monster energy drinks ($29.89), Doritos large bag (four for $14.00), Munchies Snack Mix (four for 10.00), and king size candy bars (four for $8.00).

Flagged Transactions 143-146:

These transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make four separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Two dozen doughnuts ($10.00), three large three-topping frozen specialty pizzas with free two-liter drink special ($35.67), case of 10 Monster energy drinks ($29.89), 4 frozen dinner meals ($24.00), two Coca-Cola six-packs ($10.00), 5 Pop-Tarts ($5.00), Doritos large bag (four for $14.00), three 2-liters ($6.00), Munchies Snack Mix (four for $10.00), and two gallons of whole milk ($8.00).

As further support for Marathon's position, Transactions 143-146 were conducted by Household ███████, ████████████ (Ex. 7).  As set out above and in the attached Declaration, Ahmed affirmatively attests that she only used SNAP benefits at Marathon Food Center for SNAP eligible items.  (Ex. 8).  She further attests that she has never misused SNAP benefits or purchased non-eligible items at Marathon.  (*Id*.).  Again, conceding that ████████ could not possibly recall what grocery items she purchased well over two years prior, she can affirmatively testify that her purchases were lawful, purchasing only SNAP eligible items with her SNAP benefits EBT card.

Flagged Transactions 147-150:

These transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make four separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Three boxes of cereal ($14.97), three gallons of whole milk ($12.00), 12-pack of juice clear fruit ($19.89), six Pop-Tarts ($6.00), six granola bars ($6.00), three loaves of wheat bread ($8.67), Munchies Snack Mix (two for $5.00), and a case of 10 Monster energy drinks ($29.89).

Flagged Transactions 151-155:

These transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make five separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Three large three-topping frozen specialty pizzas with free two-liter drink (special) ($35.67), case of 10 Monster energy drinks ($29.89), 4 frozen dinner meals ($24.00),

two Coca-Cola six-packs ($10.00), 5 Pop-Tarts ($5.00),  Doritos large bag (four for $14.00), three 2-liters ($6.00), Munchies Snack Mix (four for $10.00), two gallons of whole milk ($8.00), and frozen chick (two ten-pound bags) ($19.89).

Marathon therefore affirmatively attests that each and every transaction identified in Defendant's Attachment 2 was for a SNAP-eligible item and did not involve any trafficking whatsoever of SNAP benefits.

Furthermore, a closer review of the Household numbers engaging in these sets of transactions is instructive.  Six of the thirteen flagged transactions were conducted by Household number ███████.  (AR 91, 106-107).  Based upon information received by ODJFS, this Household number belongs to ████████████████ is identified by ODJFS as being homeless, marked with a "displaced" identifier in the address field.  (*See* Ex. 7).  These six transactions are thus entirely typical for a homeless person, as set out above and attested by Abner.

Based upon homeless persons' spending habits inherent with SNAP benefits, ██████ spending habits are not unusual at all.  As set out herein, the homeless tend to make larger purchases at once, and they often band together with their purchases.

The government, on the other hand, argues – by inference – that, "Multiple transactions within a set time period are methods which stores use to avoid high dollar transactions that cannot be supported and are indicative of trafficking." (AR 90).  Defendant further suggests that there is no "compelling reason for customers to consider MARATHON FOOD CENTER a first choice destination to fulfill large purchases of food, or that they would have made relatively large, multiple purchases at the store within a set period." (*Id*.).

Defendant offers no support for its conclusory allegations.  To this point, the government seemingly disregarded any legitimate explanation of these transactions outside of concluding that trafficking must have occurred.  In the Administrative Record, Defendant noted that these same

customers, whose transactions are considered suspect, also shopped at other SNAP firms in the area. (AR 96-98). Defendant found it odd that those customers often spent less at other SNAP firms than at Marathon. (*Id.*).

Based upon its flawed "analysis," Defendant essentially concludes that customers must only shop at Marathon to traffic their SNAP benefits, which is absurd and largely unfounded. Responding to these types of arguments is inherently difficult. Clearly, in the administrative process, Defendant is empowered to speculate on the spending practices of anonymous (to Marathon) customers, while the SNAP retailer is forced to offer evidence as to why on a particular day in the past its customer chose to shop at another SNAP firm on the same day that they stopped by Marathon.

Abner attests that Marathon has a regular and loyal clientele, some of whom have attested that they are attracted to Marathon for its product and service offerings (money orders, bill pay, pre-paid phones, etc.), and that Marathon's General Manager and employees are friendly, respectful, and accommodating, and because these customers know many people who frequent the store. (Ex. 1 at ¶¶ 21, 24).

Lastly, the chilling effect of holding a store accountable for how and when its customers choose to spend their funds (or benefits) is harrowing. As directed in the SNAP Training Guide for Retailers, Marathon treats its SNAP customers with courtesy and respect and accordingly, does not question their particular habits or practices. Yet, Defendant's attack on SNAP retailers would seemingly require the store to refuse service to its customers who attempt to use their EBT card more than once per a certain length of time.

In *Skyson, supra,* the plaintiff offered similar factual evidence to that offered by Marathon in the instant case. *Skyson USA, LLC v. United States*, D.Haw. No. 09-00278 BMK, 2010 U.S.

Dist. LEXIS 15108, at *12-13 (Feb. 22, 2010). Specifically, the SNAP retailer did not have shopping bags or baskets for its customers, although it did have flat-bed hand carts. *Id*. The SNAP retailer in *Skyson* also offered evidence that family members often shop together, resulting in multiple successive transactions, not unlike the case at bar. *Id*. The *Skyson* Court thus reversed the agency decision, holding that "it is entirely reasonable for individual accounts to have multiple transactions within hours, minutes, or even seconds of each other." *Id*.

Likewise, the *Four Winds* Court refused the government's motion for summary judgment which depended, in part, on "[r]epetitive transactions from the same account within unusually short time frames." *Four Winds Behavioral Health v. United States*, D.N.M. No. 19-212 SCY/LF, 2020 U.S. Dist. LEXIS 124534, at *34 (July 15, 2020). Rejecting the government's assertions, the court in *Four Winds* relied heavily upon the evidence that the "lack of shopping baskets or bags also provides a reason why Plaintiff's [customers] would make multiple trips." *Id*. The instant case requires summary judgment in Marathon's favor.

As required by judicial precedent, Marathon has submitted sworn evidence addressing each and every transaction identified by Defendant in the government's conclusory report that Marathon "trafficked" in SNAP benefits. Marathon has therefore met its summary judgment burden, and, because Defendant cannot rebut Marathon's attestations, summary judgment is appropriate in Marathon's favor.

### 3. Excessively Large Purchase Transactions Were Made from Recipient Accounts

Defendant also speculates that Marathon Food Center engaged in "a series of EBT transactions that appear excessively large based on the store's assigned store type and recorded food stock." (AR 92). Yet, in comparison to Marathon's store type, the average transaction amount for the review period differs from other similar store types in Franklin County (according

to the government's cherry-picked statistics) by a mere ▮▮▮▮▮▮▮).  (AR 85).  This hardly seems like an "excessive" transaction amount.

Then, in typical fashion, Defendant focuses on only ▮▮ transactions (a mere ▮▮ of the total reviewed transactions), all of which were more than $28, to support its conclusion that Marathon's customers spend "excessively."  (AR 108-109).  Defendant selectively narrows its sample size and compares apples to oranges to make its argument.  To carve out the highest ▮▮▮ of transactions for review (all of which are significantly above state and local averages) and then compare them to the state and local average is flagrantly misleading.  Particularly troubling is that Defendant takes the single highest transaction amount ($94.30) conducted within a six-month period and then suggests that Marathon engaged in a "pattern" of "excessively large transactions because this single transaction was over ▮▮▮▮▮▮ times the State of Ohio average.  (AR 92).  This is absurd.

Defendant does not provide the Court with the highest ▮▮ of transactions of any other store type similar to Marathon, nor is this information contained within the Administrative Record.  The reason the government fails to share that information is likely because Marathon's average transaction for its largest ▮▮▮ of transactions is smaller than the State and County's average transaction for similar stores' largest ▮▮ of transactions.

Compared to the State and County average transaction amounts, including larger stores, Marathon's average transaction amount is only slightly larger, and definitely not egregiously or suspiciously larger.

Further, Defendant suggests that these large purchases are suspect because Marathon has no shopping carts or baskets "to assist households with moving this much food around the store."

(AR 92).  Defendant offers no explanation for the argued correlation between expensive transactions and the necessity for "rapid processing," likely because there is none.

Indeed, Defendant continues its speculative comparisons using averages, selective statistics, and assumptions without offering any real qualitative data or evidence ▮ which Marathon's customers and transactions can be fairly and equally compared.  Moreover, the little evidence provided lacks any source citation, and therefore cannot be used at the summary judgment stage.

As shown in the Administrative Record, Marathon advised Defendant that in September 2017, the Shop 'n Save located within 0.1 mile of Marathon (almost catacorner) closed its doors.  (AR 112-113).  While these two neighborhood stores were competitors, they knew each other well and were highly respective of one another.  (Ex. 1 at ¶ 187).  The Shop 'n Save did accept SNAP benefits, and, after closing, many of its customers began frequenting the Marathon Food Center, thus resulting in more transactions at Marathon, plus a higher transaction amount on average.  (Ex. 1 at ¶¶ 188-189).

Further, there are several reasons why customers buy large amounts of groceries in a single trip.  (*Id*. at ¶ 189).  Many do not have transportation but can obtain transportation from family members or relatives.  (*Id*. at ¶ 190).  In that case, the customer may "stock up" on groceries.  (*Id*.).

With respect to Defendant's suggestion that the flagged transactions are "excessively large," such that they infer trafficking, these transaction amounts fit entirely within Marathon's pricing structure, as detailed more fully above.  (Ex. 1 at ¶ 191).  Marathon therefore submits evidentiary support to rebut each of these flagged transactions, as required by judicial precedent.  *See, e.g., McClain's Mkt.*, 214 Fed.Appx. at 505; *Ganesh*, 658 Fed.Appx. at 221; *Skyson USA, LLC*, U.S. at *12-13.

Specifically, Abner has thoroughly reviewed, in great detail, all transactions identified by the federal government which Defendant suggests is "trafficking" in SNAP benefits. (Ex. 1 at ¶ 121). What follows is Abner's sworn declaration concerning each and every "excessively large transaction," as set forth in Abner's sworn Declaration at Exhibit 1, Paragraphs 192-281.

Transaction 156: This transaction was made during a time at which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), 20-pound bag of frozen hot wings ($20.00), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), wheat bread ($2.89), regular bread ($1.89), packaged lunch meat bologna ($0.89), packaged lunch meat salami ($0.89), two large two-topping frozen specialty pizzas ($19.78), two 2-liters ($4.00).

Transaction 157: This transaction was also made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two dozen doughnuts ($10.00), two gallons of milk with two family-size boxes of cereal special ($17.89), case of 12 Red Bull ($34.19), two wheat bread ($5.78), two jugs of juice ($5.78), two packaged lunch meat bologna ($1.78), two packaged lunch meat salami ($1.78).

Transaction 158: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two dozen doughnuts ($10.00), 12-pack of juice clear fruit ($19.89), two gallons of milk with two family-size boxes of cereal special ($17.89), four Pop Tarts ($4.00), four granola bars ($4.00), two jugs of juice ($5.78), four small hostess snacks ($4.00), four small little Debbie snacks ($4.00).

Transaction 159: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two dozen doughnuts ($10.00), case of 12 Red Bull ($34.19), two gallons of whole vitamin D milk ($8.00), jug of juice ($2.89), five Pop-Tarts ($5.00).

Transaction 160: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two dozen doughnuts ($10.00), case of 12 Red Bull ($34.19), two gallons of whole vitamin D milk ($8.00), jug of juice ($2.89), five Pop-Tarts ($5.00).

Transaction 161: This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00), large three-topping frozen specialty pizza with free two-liter drink special ($11.89), two candy bars ($3.78).

Transaction 162: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00), two Coca-Cola six-packs ($10.00), three small cans of Pringles ($3.00).

Transaction 163: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00), large three-topping frozen specialty pizza with free two-liter drink special ($11.89).

Transaction 164: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00), large three-topping frozen specialty pizza with free two-liter drink special ($11.89).

Transaction 165: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), two 2-liters ($4.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00), five little Debbie snacks ($5.00).

Transaction 166: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), two 2-liters ($4.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00), five little Debbie snacks ($5.00).

Transaction 167: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large-three topping specialty frozen pizzas special ($20.00), two 2-liters ($4.00), Munchies Snack Mix (four for $10.00), Doritos large bag (four for $14.00).

<u>Transaction 168:</u> This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Frozen chicken 10-pound bag ($14.89), two 2-liters ($4.00), four candy bars ($7.56), four small cans of Pringles ($4.00), large two-topping frozen specialty pizza ($9.89), Munchies Snack Mix (two for $5.00).

<u>Transaction 169:</u> This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), two 2-liters ($4.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00), five little Debbie snacks ($5.00).

<u>Transaction 170:</u> This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), two 2-liters ($4.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00), five little Debbie snacks ($5.00).

<u>Transaction 171:</u> This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), two 2-liters ($4.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00).

<u>Transaction 172:</u> This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), two 2-liters ($4.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00).

<u>Transaction 173:</u> This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), two 2-liters ($4.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00).

<u>Transaction 174:</u> This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), two 2-liters ($4.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00).

<u>Transaction 175:</u> This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), two 2-liters ($4.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), five small hostess snacks ($5.00).

Transaction 176: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), three 2-liters ($6.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00).

Transaction 177: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), three 2-liters ($6.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00).

Transaction 178: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), three 2-liters ($6.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00).

Transaction 179:  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), large two-topping frozen specialty pizza ($9.89), three 2-liters ($6.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00).

Transaction 180: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two-large three topping specialty frozen pizzas special ($20.00), frozen chicken (two ten-pound bags) ($19.89).

Transaction 181: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00), candy bar ($1.89).

Transaction 182: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00), pack of gum ($1.00).

Transaction 183: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00), pack of gum ($1.00).

Transaction 184: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00), pack of gum ($1.00).

Transaction 185: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00), pack of gum ($1.00).

Transaction 186: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00).

Transaction 187: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00), pack of gum ($1.00), candy bar ($0.89).

Transaction 188: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00), candy bar ($0.89).

Transaction 189: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00), pack of gum ($1.00), candy bar ($0.89).

Transaction 190: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00), pack of gum ($1.00), candy bar ($0.89).

Transaction 191:  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00), pack of gum ($1.00), candy bar ($0.89).

Transaction 192:  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), two Coca-Cola six-packs ($10.00), Doritos large bag (two for $7.00).

Transaction 193:  This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), large two-topping frozen specialty pizza ($9.89), Coca-Cola six-pack ($5.00), two small cans of Pringles ($2.00).

Transaction 194:  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two dozen doughnuts ($10.00), two jugs of juice ($5.78), two gallons of whole vitamin d milk ($8.00), three Pop-Tarts ($3.00), Munchies Snack Mix (two for $5.00), three candy bars ($5.67).

Transaction 195:  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), large two-topping frozen specialty pizza ($9.89), Coca-Cola six-pack ($5.00), small can of Pringles ($1.00).

Transaction 196:  This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), large two-topping frozen specialty pizza ($9.89), Coca-Cola six-pack ($5.00), small can of Pringles ($1.00).

Transaction 197:  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), large two-topping frozen specialty pizza ($9.89), Coca-Cola six-pack ($5.00), small can of Pringles ($1.00).

Transaction 198:  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), large two-topping frozen specialty pizza ($9.89), Coca-Cola six-pack ($5.00), small can of Pringles ($1.00).

Transaction 199:   This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), large two-topping frozen specialty pizza ($9.89), Coca-Cola six-pack ($5.00).

<u>Transaction 200:</u>  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), large two-topping frozen specialty pizza ($9.89), Coca-Cola six-pack ($5.00).

<u>Transaction 201:</u>  This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), large two-topping frozen specialty pizza ($9.89), Coca-Cola six-pack ($5.00).

<u>Transaction 202:</u>  This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), large two-topping frozen specialty pizza ($9.89), Coca-Cola six-pack ($5.00).

<u>Transaction 203:</u> This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), large two-topping frozen specialty pizza ($9.89), Coca-Cola six-pack ($5.00).

<u>Transaction 204:</u>  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), Coca-Cola six-pack ($5.00), two dozen doughnuts ($10.00).

Transaction 205:  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), large two-topping frozen specialty pizza five 16-ounce drinks ($5.00), Coca-Cola six-pack ($5.00), Munchies Snack Mix (two for $5.00).

Transaction 206:  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), large two-topping frozen specialty pizza ($9.89), Munchies Snack Mix (two for $5.00).

Transaction 207: This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), large two-topping frozen specialty pizza ($9.89), Munchies Snack Mix (two for $5.00).

Transaction 208: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), large two-topping frozen specialty pizza ($9.89), Munchies Snack Mix (two for $5.00).

Transaction 209: This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), large two-topping frozen specialty pizza ($9.89), two bags of chips ($3.78).

<u>Transaction 210:</u> This transaction was made during a time in which most food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), large two-topping frozen specialty pizza ($9.89), two bags of chips ($3.78).

<u>Transaction 211:</u> This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), large two-topping frozen specialty pizza ($9.89), two bags of chips ($3.78).

<u>Transaction 212:</u> This transaction was made during a time in which most grocery stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Coca-Cola six-pack ($5.00), Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), three frozen dinners ($18.00).

<u>Transaction 213:</u> This transaction was made during a time in which many food stores are closed on Christmas Day. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two Coca-Cola six-packs ($10.00), two Munchies Snack Mix (four for $10.00), two 2-liters ($4.00), five 16-ounce drinks ($5.00).

<u>Transaction 214:</u> This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two dozen doughnuts ($10.00), three Pop-Tarts ($3.00), Coca-Cola six-pack ($5.00), two bags of chips ($3.78), gallon of whole vitamin D milk, ($4.00), cereal ($4.99), jug of juice ($2.89).

Transaction 215: This transaction was made during a time in which some food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two dozen doughnuts ($10.00), three Pop-Tarts ($3.00), Coca-Cola six-pack ($5.00), two bags of chips ($3.78), gallon of whole vitamin D milk, ($4.00), cereal ($4.99), jug of juice ($2.89).

Transaction 216:  This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), jug of juice ($2.89), three candy bars ($8.67), pack of gum ($1.00).

Transaction 217: This transaction was made during a time in which some food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), jug of juice ($2.89), three candy bars ($8.67), pack of gum ($1.00).

Transaction 218: This transaction was made during a time in which some food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), jug of juice ($2.89), Munchies Snack Mix (four for $10.00).

Transaction 219: This transaction was made during a time in which some food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), jug of juice ($2.89), three candy bars ($8.67).

Transaction 220: This transaction was made during a time in which some food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), wheat bread ($2.89), three candy bars ($8.67).

Transaction 221: This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), two large two-topping frozen specialty pizza ($19.78).

Transaction 222: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), Munchies Snack Mix (two for $5.00), Doritos large bag (two for $7.00).

Transaction 223: This transaction was made during a time in which some food stores are closed. This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), two large two-topping frozen specialty pizza ($19.78).

Transaction 224: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), two large two-topping frozen specialty pizza ($19.78).

Transaction 225:  This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), gallon of whole vitamin D milk ($4.00), Doritos large bag (two for $7.00).

Transaction 226: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), three 16-ounce drinks ($3.00), Doritos large bag (two for $7.00).

Transaction 227:  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Doritos large bag (two for $7.00), Munchies Snack Mix (two for $5.00), two 2-liters ($4.00), large two-topping frozen specialty pizza ($9.89), jug of juice ($2.89), two small hostess snacks ($2.00).

Transaction 228: This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), two 2-liters ($4.00), Doritos large bag (two for $7.00).

Transaction 229: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), two Coca-Cola six-packs ($10.00)

Transaction 230: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), two Coca-Cola six-packs ($10.00)

Transaction 231: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), two Coca-Cola six-packs ($10.00)

Transaction 232:  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), Munchies Snack Mix (four for $10.00)

Transaction 233: transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), large two-topping frozen specialty pizza ($9.89).

Transaction 234: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Two large three-topping specialty frozen pizzas special ($20.00), large two-topping frozen specialty pizza ($9.89).

74

<u>Transaction 235:</u> This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), large two-topping frozen specialty pizza ($9.89).

<u>Transaction 235:</u>  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), large two-topping frozen specialty pizza ($9.89).

<u>Transaction 237:</u> This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- 20-pound bag of frozen hot wings ($20.00), gallon of whole vitamin D milk ($4.00), Munchies Snack Mix (two for $5.00).

<u>Transaction 238:</u> This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), frozen chicken 10-pound bag ($14.89).

<u>Transaction 239:</u> This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), frozen chicken 10-pound bag ($14.89).

Transaction 240: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), frozen chicken 10-pound bag ($14.89).

Transaction 241: This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Large three-topping frozen specialty pizza with free two-liter drink special ($11.89), frozen chicken 10-pound bag ($14.89).

Transaction 242: This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Frozen chicken (two ten-pound bags) ($19.89), large two-topping frozen specialty pizza ($9.89).

Transaction 243: This transaction was made during a time in which most food stores are closed.  This transaction does not represent trafficking. Rather, this was a bona fide purchase of SNAP-eligible items, which would or could have included a combination of any of the following:

- Frozen chicken (two ten-pound bags) ($19.89), large two-topping frozen specialty pizza ($9.89).

In addition, several "excessively large" transactions identified by Defendant in its analysis were conducted by SNAP recipients who affirmatively attest that they have only used SNAP benefits at Marathon Food Center for SNAP eligible items.  (*See* Exs 8, 9, 11).   These Affiants also attest that they have never misused SNAP benefits or purchased non-eligible items at Marathon.  (*Id.*)

Specifically, the Affiants and related transactions are shown below:

- ███████████ Household ██████████ :  Four transactions of $48.80, $37.84, $36.21, $34.79.  (Ex. 8 at ¶¶ 3-6).

- ████████████ Household ████████ :  Eight transactions of $48.00, $38.00, $37.00, $35.00, $30.47, $30.00, $30.00, $28.89. (Ex. 9 at ¶¶ 4-6).

- ███████████ Household ████████ :  One transaction of $33.08.  (Ex. 11 at ¶¶ 4-6).

As acknowledged above, these Affiants could not possibly attest to what they specifically purchased from Marathon on a particular date occurring nearly three years prior.  Nonetheless, these Affiants affirmatively attest, under penalty of perjury, that their corresponding SNAP benefits were never misused and that they only purchased SNAP eligible items with SNAP benefits at Marathon Food Center.  (Exs. 8, 9, 11).  This satisfies Marathon's evidentiary burden in rebutting the specific transactions at issue in this litigation.

Moreover, as set out in great detail above, Marathon's then-existing inventory and pricing structure can easily justify transaction amounts in the arbitrarily defined range set out in Defendant's Attachment 3 in the Administrative Record.  Marathon does not dispute that its prices are higher, and in some cases significantly higher, than larger supermarkets such as Kroger and Giant Eagle.  This will of course lend itself to larger purchase amounts for a smaller set of groceries.

Most of what the government defines as an "excessively large" transaction is within the range of ██████████ .  (AR 108-109).  This purchase amount does not give a customer a whole lot of food at a convenience store like Marathon.  Four frozen pizzas amount to a purchase price of just under $40.00.  As shown with the above rebuttals, these transactions identified in Attachment 3 fall well within Marathon's pricing structure.

Defendant, on the other hand, might ask how these "larger" purchases can be carried to the counter at once, further inquiring why multiple transactions are not needed due to the lack of shopping carts or baskets. But with that argument, Defendant wants to have its cake and eat it too. On the one hand, Defendant suggests that "repeat" transactions within a short period of time constitute "trafficking." In the same vein, Defendant then suggests that "larger" purchases should not be possible because Marathon does not use shopping carts or baskets.

The answer is simple. Shopping patterns vary amongst customers. A customer purchasing three to four higher-priced food items typically can manage the transaction in one trip to the counter (or otherwise have a family member assist with carrying groceries). On the other hand, a customer purchasing several "smaller" items will likely need to make two trips. For example, four frozen pizzas, which can easily be carried in one trip, will total nearly $40.00 for the purchase transaction. Five gallons of milk and five boxes of cereal will require multiple trips and consequently multiple transactions. This is not at all unusual.

In *Skyson, supra,* similar inferences were made by the government in questioning the variety of "larger" purchases made by the SNAP retailer's customers, particularly concerning the plaintiff's homeless customers. *Skyson USA, LLC v. United States*, D.Haw. No. 09-00278 BMK, 2010 U.S. Dist. LEXIS 15108, at *12-13 (Feb. 22, 2010). The *Skyson* court agreed with the plaintiff that larger purchases conducted by the homeless population were reasonable. *Id*. The *Skyson* Court thus reversed the agency decision based upon the rebuttal evidence offered by the store. *Id*.

In sum, consistent with the evidentiary standard for SNAP disqualification cases, Marathon affirmatively attests that each and every transaction identified in Defendant's Attachment 3 was for a SNAP-eligible item and did not involve any trafficking whatsoever of SNAP benefits.

4.     <u>Individual Household Analyses</u>

Finally, the federal government embarks on a perceived "Individual Household Analysis," cherry-picking five SNAP recipients for whom to conduct a further review of each Household's SNAP transactions from the relevant review period.  (AR 95-98).  Instructively, these five Households were already identified by Defendant in Attachment 2 as conducting "repetitive transactions in a set period of time."  (AR 90-91).  Accordingly, these transactions have been rebutted as set out more fully above.  Nevertheless, given that each identified transaction is considered a "separate violation," Marathon further rebuts each and every transaction below.

Specifically, Abner has thoroughly reviewed, in great detail, all transactions identified by the federal government within each of the five Household analyses.  (Ex. 1 at ¶ 121).  What follows is Abner's sworn declarations concerning each and every "transaction" conducted by the five Households in question, as set forth in Abner's sworn Declaration at Exhibit 1, Paragraphs 285-301).

a.     <u>Household  o. ████████  ██</u>

This SNAP Household number identifies SNAP recipient ████████.  (Ex. 7).  As discussed above, ODJFS reports ████ to be homeless.  (*Id*.).  As attested by Abner and explained herein, homeless persons have different SNAP spending habits.  They sometimes band together to purchase food for the group, resulting in higher purchase amounts.  Homeless persons also may make larger purchases at one time because they do not have reliable transportation.

For these reasons, there is nothing unusual about ████ SNAP transactions.  It is more likely than not that ████ could not carry to the counter in ██ trip all of the items she was purchasing.  Nonetheless, Marathon General Manager Abner attests that each and every one of these identified transactions was for eligible SNAP items.

September 18 Transactions:

As explained above, these transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make three separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together (i.e. homeless banding together).  All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Case of 10 Monster energy drinks ($29.89), Doritos large bag (four for $14.00), Coca-Cola 24-pack ($12.00), Munchies Snack Mix (four for $10.00), ten small hostess snacks ($10.00), five small cans of Pringles ($5.00), several bags of chips ($2.89 each), and two dozen doughnuts ($10.00).

November 18 Transactions:

As also explained above, these transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make four separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together (i.e. homeless banding together).  All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Three boxes of cereal ($14.97), three gallons of whole milk ($12.00), 12-pack of juice clear fruit ($19.89), six Pop-Tarts ($6.00), six granola bars ($6.00), three loaves of wheat bread ($8.67), Munchies Snack Mix (two for $5.00), and a case of 10 Monster energy drinks ($29.89).

January 13 Transactions:

As explained above, these transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make four separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals

were shopping together (i.e. homeless banding together).  All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Case of 10 Monster energy drinks ($29.89), Doritos large bag (four for $14.00), Coca-Cola 24-pack ($12.00), Munchies Snack Mix (four for $10.00), ten small hostess snacks ($10.00), five small cans of Pringles ($5.00), several bags of chips ($2.89 each), and two dozen doughnuts ($10.00).

January 25 and January 27 Transactions:

As explained above, these transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make four separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together (i.e. homeless banding together).  All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- January 25:  Two dozen doughnuts ($10.00), two gallons of milk with two family-size boxes of cereal (special for $17.89), case of 12 Red Bull (Transaction 111) ($34.19), two loaves of wheat bread ($5.78), two jugs of juice ($5.78), two packaged lunch meat bologna ($1.78), two packaged lunch meat salami ($1.78).

- January 27:  Three boxes of cereal ($14.97), three gallons of whole milk ($12.00), 12-pack of juice clear fruit ($19.89), six Pop-Tarts ($6.00), six granola bars ($6.00), three loaves of wheat bread ($8.67), Munchies Snack Mix (two for $5.00), a case of 10 Monster energy drinks ($29.89), Doritos large bag (four for $14.00), Munchies Snack Mix (four for 10.00), and king size candy bars (four for $8.00).

February 28 Transactions:

As rebutted above, these transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make four separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together (i.e. homeless banding together).  All of these transactions were bona fide

purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Three boxes of cereal ($14.97), three gallons of whole milk ($12.00), 12-pack of juice clear fruit ($19.89), six Pop-Tarts ($6.00), six granola bars ($6.00), three loaves of wheat bread ($8.67), Munchies Snack Mix (two for $5.00), and a case of 10 Monster energy drinks ($29.89).

Notably absent from this Household's analysis is any data showing Tinsley's purchasing patterns at other food stores or supermarkets. (AR 95-96). Indeed, the government shows only two other transactions undertaken by this SNAP recipient: (i) one at Shop & Save for $3.00 and (ii) one at Save a Lot for $84.79. (*Id.*).

The Shop & Save transaction of $3.00 carries no statistical weight, given that ███████ balance at the time was a mere $3.36, hence the small transaction of $3.00. (AR 95). The Save a Lot transaction of $84.79 is not inconsistent with ███████ shopping habits, as discussed above.

b.  <u>Household No. ███████ ███</u>

For this Household, Defendant suggests that trafficking occurred because this SNAP recipient conducted only four transactions at Marathon in a six-month period, and yet because the recipient engaged in separate successive transactions, Marathon was purchasing SNAP benefits with cash. (AR 96). Marathon has offered evidence showing why SNAP recipients may need to engage in separate transactions.

Again, these transactions do not represent trafficking. Rather, all of these transactions were the result of the SNAP household needing to make four separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together. All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following for the two transactions:

- Frozen chicken (two ten-pound bags) ($19.89), two large three-topping specialty frozen pizzas (special) ($20.00), 12-pack of juice clear fruit ($19.89), Doritos large bag (two for $7.00), case of 10 Monster energy drinks ($29.89), two gallons of whole vitamin D milk ($8.00), and two-dozen doughnuts ($10.00).

Defendant conveniently fails to acknowledge the time at which these transactions were conducted.  (*See* AR 96).  The transactions occurring at Kroger and Meijer were made during normal business/shopping hours.  (*Id*).  The Marathon transactions, however, occurred just past 12:30 AM.  No other food store was open, and certainly not any supermarkets.  This SNAP recipient was thus left no choice but to buy her groceries at Marathon at this time of night.

### c.    Household No. ██████ ███

As set out above and in the attached Declaration of Abner, these transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make five separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together.  All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Two dozen doughnuts ($10.00), three large three-topping frozen specialty pizzas with free two-liter drink (special) ($35.67), case of 10 Monster energy drinks ($29.89), 4 frozen dinner meals ($24.00), two Coca-Cola six-packs ($10.00), 5 Pop-Tarts ($5.00), Doritos large bag (four for $14.00), three 2-liters ($6.00), Munchies Snack Mix (four for $10.00), two gallons of whole milk ($8.00), and two large three-topping specialty frozen pizzas (special) ($20.00).

October 4 Transactions:

Similarly, these transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make five separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were

shopping together.  All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Case of 10 Monster energy drinks ($29.89), Doritos large bag (four for $14.00), Coca-Cola 24-pack ($12.00), Munchies Snack Mix (four for $10.00), ten small hostess snacks ($10.00), five small cans of Pringles ($5.00), several bags of chips ($2.89 each), and two dozen doughnuts ($10.00).

        d.    <u>Household No.</u> ███ ███

For this Household, Defendant suggests that trafficking occurred because this SNAP recipient conducted only four transactions at Marathon in a six-month period, and yet because the recipient engaged in separate successive transactions, Marathon was purchasing SNAP benefits with cash.  (AR 97).

Again, these transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make four separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together.  All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Two dozen doughnuts ($10.00), three large three-topping frozen specialty pizzas with free two-liter drink special ($35.67), case of 10 Monster energy drinks ($29.89), 4 frozen dinner meals ($24.00), two Coca-Cola six-packs ($10.00), 5 Pop-Tarts ($5.00), Doritos large bag (four for $14.00), three 2-liters ($6.00), Munchies Snack Mix (four for $10.00), and two gallons of whole milk ($8.00).

As further support for Marathon's position, this SNAP recipient is ████████ (Ex. 7). As set out above and in the attached Declaration, ████ affirmatively attests that she only used SNAP benefits at Marathon Food Center for SNAP eligible items.  (Ex. 8).  She further attests that she has never misused SNAP benefits or purchased non-eligible items at Marathon.  (*Id.*).  Again, conceding that ████ could not possibly recall what grocery items she purchased well over two

years prior, she nonetheless affirmatively attests that her purchases were lawful, purchasing only SNAP eligible items with her SNAP benefits EBT card at Marathon.

> e.  <u>Household No. ███████</u>

This Household also was flagged because it conducted a mere six transactions at Marathon in a six-month review period.  (AR 98).  Again, these identified transactions do not represent trafficking.  Rather, all of these transactions were the result of the SNAP household needing to make five separate transactions with its EBT card, either due to the lack of a shopping cart or basket or because multiple individuals were shopping together.  All of these transactions were bona fide purchases of SNAP eligible items, which collectively would or could have included a combination of any of the following:

- Three large three-topping frozen specialty pizzas with free two-liter drink (special) ($35.67), case of 10 Monster energy drinks ($29.89), 4 frozen dinner meals ($24.00), two Coca-Cola six-packs ($10.00), 5 Pop-Tarts ($5.00),  Doritos large bag (four for $14.00), three 2-liters ($6.00), Munchies Snack Mix (four for $10.00), two gallons of whole milk ($8.00), and frozen chick (two ten-pound bags) ($19.89).

In sum, consistent with the evidentiary standard for SNAP disqualification cases, Marathon affirmatively attests that each and every transaction identified in Defendant's Individual Household Analysis was for a SNAP-eligible item and did not involve any trafficking whatsoever of SNAP benefits.

> 4.  <u>Marathon's Credit and Debit Card Transactions</u>

Marathon has conducted a review of credit and debit card transactions for its store within a fifteen-month period ranging from September 2017 through November 2018.  (Ex. 2 at ¶ 7; Ex. 3).  The purpose of this review is to compare the credit and debit card spending habits with those EBT spending "patterns" cherry-picked by the federal government.  Marathon's review shows that those EBT shopping habits and patterns selectively chosen by the government for review and

analysis are entirely consistent with the shopping habits of those Marathon customers paying by credit or debit card rather than EBT card.

Attached as Exhibit 3, and attested by Abner, is a summary of several credit and/or debit card transactions conducted by Marathon customers.[6] These transaction "patterns" are no different than the type of EBT transaction "patterns" which Defendant suggests are indicative of "trafficking."

Marathon's review of its credit and debit card transactions produces the following summaries, complete with factually supported analyses:

## Credit/Debit Review #1

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 01/12/18 | 09:45:39 | $ 9.99 | Visa | Inside Payment |
| | | | 01/12/18 | 12:53:47 | $ 18.89 | Visa | Inside Payment |
| | | | 01/12/18 | 14:08:37 | $ 6.99 | Visa | Inside Payment |
| | | | 01/12/18 | 14:09:06 | $ 6.99 | Visa | Inside Payment |
| | | | 01/12/18 | 17:17:12 | $ 7.38 | Visa | Inside Payment |
| | | | 01/12/18 | 18:47:41 | $ 6.00 | Visa | Inside Payment |
| | | | 01/12/18 | 18:48:22 | $ 10.00 | Visa | Inside Payment |
| | | | 01/12/18 | 19:49:22 | $ 4.00 | Visa | Inside Payment |
| | | | 01/12/18 | 20:01:12 | $ 4.50 | Visa | Inside Payment |

This Marathon customer made 9 transactions, on the same date, beginning at 9:45 AM and ending at 8:01 PM. The transactions reflect an "unusual" shopping and/or lifestyle habit of visiting the same store 9 times within one day. Defendant would suggest this clearly is indicative of "trafficking" in SNAP benefits. For all intents and purposes, it appears that visiting Marathon Food Center was quite the "highlight of the day" for this particular customer, speaking to either the extreme reliance on Marathon due to proximity, or neighborhood camaraderie, or simply giving this customer something to do. Further, this analysis also shows a set of 2 transactions completed only 29 seconds apart and another set of 2 transactions within 41 seconds of each other. As stated above, Marathon customers often make purchases back-to-back, even when NOT using SNAP/EBT benefits.

---

[6] As acknowledged in its Motion for Summary Judgment, Defendant received a copy of the credit and debit card transactions. (Def. Motion at PAGEID 373). As further acknowledged by Defendant, this data is voluminous. (*Id.*). Pursuant to Federal Rule of Evidence 1006, Marathon herein submits a summary of this voluminous data for purposes of the instant Memorandum and Cross-Motion for Summary Judgment.

## **Credit/Debit Review #2**

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 02/22/18 | 12:48:49 | $ 8.89 | Visa | Inside Payment |
| | | | 02/22/18 | 18:16:51 | $ 7.89 | Visa | Inside Payment |
| | | | 02/22/18 | 18:17:25 | $ 8.89 | Visa | Inside Payment |

This Marathon customer made 3 transactions, on the same date, with all 3 ending in 89 cents and not far under the Defendant's $9.00 apparent threshold. Further, 2 of the 3 transactions were completed with only 34 seconds between them, not only showing the speed at which the Marathon cashiers can process purchases, but also the same customer making separate purchases, back-to-back, during the same trip.

## **Credit/Debit Review #3**

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 03/04/18 | 12:56:48 | $ 19.89 | Visa | Inside Payment |
| | | | 03/04/18 | 13:30:21 | $ 19.89 | Visa | Inside Payment |
| | | | 03/04/18 | 14:04:24 | $ 28.89 | Visa | Inside Payment |

This Marathon customer made 3 transactions, on the same date, in less than a 2-hour span of time, with all 3 transactions ending in 89 cents and significantly higher than $9.00. As above, this shows that even customers NOT paying with SNAP/EBT benefits make multiple purchases back-to-back, in amounts ending in 89 cents and in large amounts over $9.00. Further, considering the approximately 30 minutes between purchases speaks to the customers' tendency to "mill around" the store, or close to it. In the alternative, the unusual time stamp of these 3 transactions could also speak to this customer's need to make separate shopping trips due to the lack of shopping carts and/or baskets in which to carry the items. Some may even need to walk back to their home, then return to the store.

## **Credit/Debit Review #4**

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 10/28/18 | 09:00:05 | $ 11.99 | MC | Inside Payment |
| | | | 10/28/18 | 09:01:08 | $ 19.89 | MC | Inside Payment |
| | | | 10/28/18 | 09:05:11 | $ 19.89 | MC | Inside Payment |
| | | | 10/28/18 | 09:24:48 | $ 9.89 | MC | Inside Payment |
| | | | 10/28/18 | 09:25:50 | $ 7.99 | MC | Inside Payment |

This Marathon customer made 5 transactions, on the same date, all occurring in approximately 25 minutes, with 4 of the 5 transactions ending in 89 cents and in amounts over $9.00. The pattern of these transactions suggests the customer's apparent need to make separate shopping trips due to the lack of shopping carts and/or baskets in which to carry the items. This also shows the

possibility and tendency for customers to linger around the store, or close to it, in between purchases. If anything, this is certainly not the "usual" shopping habits found in large supermarkets, but it is of Marathon.

## Credit/Debit Review #5

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 09/15/17 | 02:21:55 | $ 21.64 | MC | Inside Payment |
| | | | 09/15/17 | 02:22:57 | $ 22.50 | MC | Inside Payment |
| | | | 09/15/17 | 07:57:15 | $ 26.25 | MC | Inside Payment |
| | | | 09/15/17 | 08:11:35 | $ 5.00 | MC | Inside Payment |
| | | | 09/15/17 | 16:48:52 | $ 20.50 | MC | Inside Payment |
| | | | 09/15/17 | 18:29:28 | $ 22.47 | MC | Inside Payment |

This Marathon customer made 6 transactions, on the same date, beginning at 2:21 AM and ending at 6:29 PM. The transactions reflect an "unusual" shopping pattern with the purchases spread throughout the middle of the night, morning and into the evening. This also shows, again, reliance on Marathon for its food, drinks and other items stocked by Marathon, at times when no other stores in the area are open. This also shows an "unusual" shopping and/or lifestyle habit of visiting the same store 6 times within one day. Further, this also shows 2 transactions completed 62 seconds apart (suggesting a quick return to the counter for a subsequent checkout) and 2 other transactions completed approximately 14 minutes apart (suggesting some time spent loitering, shopping at some length again, or visiting with others at the store).

## Credit/Debit Review #6

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 02/02/18 | 13:52:22 | $ 9.89 | MC | Inside Payment |
| | | | 02/02/18 | 15:21:55 | $ 19.89 | MC | Inside Payment |
| | | | 02/02/18 | 15:57:08 | $ 27.99 | MC | Inside Payment |

This Marathon customer made 3 transactions, on the same date, within a 2-hour span of time, with 2 of the 3 transactions ending in 89 cents, and all 3 transactions totaling over $9. Yet, if similar transactions are completed by a SNAP/EBT recipient, Defendant considers it to be a sign of trafficking, which it is not. Further, considering the 3:57 PM transaction was made approximately 35 minutes after the customer's previous purchase, speaks to the customers' tendency to "mill about" store, or close to it. In the alternative, the unusual time stamp of these 2 transactions could also speak to this customer's need to make separate shopping trips due to the lack of shopping carts and/or baskets in which to carry the items.

## Credit/Debit Review #7

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 10/08/18 | 10:18:10 | $ 28.89 | MC | Inside Payment |
| | | | 10/08/18 | 15:29:28 | $ 13.89 | MC | Inside Payment |
| | | | 10/08/18 | 15:36:26 | $ 11.89 | MC | Inside Payment |

This Marathon customer made 3 transactions, on the same date, with all 3 transactions ending in 89 cents and significantly higher than $9.00. Two of the transactions were also completed within only 10 minutes of each other. Again, this shows that even customers NOT paying with SNAP/EBT benefits make multiple purchases back-to-back, in amounts ending in 89 cents and in large amounts over $9.00. Further, considering the approximately 10 minutes between purchases speaks to the customers' tendency to "mill around" and linger around the store, or close to it, between purchases. Further, the approximate 5-hour difference between the customer's first (10:18 AM) and second (3:29 PM) transactions, speaks to customers' need to make multiple shopping trips, either by necessity or preference.

## Credit/Debit Review #8

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 10/15/18 | 12:24:12 | $ 19.89 | Visa | Inside Payment |
| | | | 10/15/18 | 12:24:45 | $ 19.89 | Visa | Inside Payment |

This Marathon customer made 2 transactions, on the same date, within 33 seconds between them. Both transactions ended in 89 cents and were significantly above $9.00. Again, this shows that even customers NOT paying with SNAP/EBT benefits make multiple purchases back-to-back, in amounts ending in 89 cents and in large amounts over $9.00. Further, this also speaks to the speed at which Marathon's cashiers can process checkouts, making back-to-back transactions all that more possibly and likely.

## Credit/Debit Review #9

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 01/21/18 | 04:41:01 | $ 3.62 | MC | Inside Payment |
| | | | 01/21/18 | 04:41:23 | $ 7.25 | MC | Inside Payment |
| | | | 01/21/18 | 05:17:08 | $ 4.19 | MC | Inside Payment |
| | | | 01/21/18 | 06:31:26 | $ 2.06 | MC | Inside Payment |
| | | | 01/21/18 | 09:10:34 | $ 4.99 | MC | Inside Payment |
| | | | 01/21/18 | 09:19:22 | $ 4.99 | MC | Inside Payment |
| | | | 01/21/18 | 09:20:36 | $ 7.75 | MC | Inside Payment |

This Marathon customer made 7 transactions on the same date, beginning at 4:41 AM and ending at 9:20 AM. Not only does this show the pattern of irregular schedules and/or shopping habits,

specifically, visiting the same store 7 times in one day, it also shows a reliance on Marathon for food, drinks and other items stocked by Marathon, at times when no other stores in the area are open. Further, this also shows 2 transactions completed within 22 seconds of each other, and 3 transactions completed in less than a 10-minute time span (with 2 of these 3 completed back-to-back in less than 1 minute). Among others, the latter transaction pattern speaks to Marathon's customers lingering around the store in between purchases.

## Credit/Debit Review #10

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 01/08/18 | 11:43:10 | $    9.89 | Visa | Inside Payment |
| | | | 01/08/18 | 13:47:06 | $  16.89 | Visa | Inside Payment |

This Marathon customer made 2 transactions, on the same date, within a 2-hour span of time, both ending in 89 cents and both over $9.00. Yet, if similar transactions are completed by a SNAP/EBT recipient, Defendant considers it to be a sign of trafficking, which it is not.

## Credit/Debit Review #11

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 01/04/18 | 01:05:57 | $  63.90 | MC | Inside Payment |
| | | | 01/04/18 | 01:10:50 | $    8.58 | MC | Inside Payment |
| | | | 01/04/18 | 01:11:13 | $    1.92 | MC | Inside Payment |

This Marathon customer made 3 transactions, on the same date, within a 5-minute span of time. Not only do these transactions reflect an "unusual" shopping pattern with the purchases occurring at 1:05 AM, 1:10 AM and 1:11 AM, it shows a reliance on Marathon for its food, drinks and other items stocked by Marathon, at times when no other stores in the area are open. The large transaction of $63.90 also suggests shopping for "more than just snacks," and more along the lines of household grocery shopping.

## Credit/Debit Review #12

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 09/15/18 | 01:52:46 | $    1.29 | MC | Inside Payment |
| | | | 09/15/18 | 04:37:41 | $    3.19 | MC | Inside Payment |
| | | | 09/15/18 | 04:57:41 | $    7.49 | MC | Inside Payment |
| | | | 09/15/18 | 06:53:53 | $    6.19 | MC | Inside Payment |
| | | | 09/15/18 | 08:09:12 | $    8.18 | MC | Inside Payment |
| | | | 09/15/18 | 12:46:05 | $    4.40 | MC | Inside Payment |

This Marathon customer made 6 transactions, on the same date, starting at the very early hour of 1:52 AM, then again at 4:37 AM and 4:57 AM, and continuing through the morning and into the

afternoon. Not only does this reflect an "unusual" shopping pattern and/or lifestyle habit, it also shows a heavy reliance on Marathon for its food, drinks and other items stocked by Marathon, at times when no other stores in the area are open.  Additionally, this also shows 2 separate transactions, by the same customer, completed with approximately 20 minutes between them, speaking to tendency for customers to linger around the store, or close to it, in between purchases.

### Credit/Debit Review #13

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 09/02/17 | 05:05:57 | $ 6.93 | Visa | Inside Payment |
| | | | 09/02/17 | 07:19:23 | $ 9.81 | Visa | Inside Payment |
| | | | 09/02/17 | 10:13:38 | $ 5.55 | Visa | Inside Payment |
| | | | 09/02/17 | 22:36:20 | $ 18.75 | Visa | Inside Payment |

This Marathon customer made 4 transactions, on the same date, starting at the early hour of 5:05 AM and ending at the very late hour of 10:36 PM. Not only does this reflect an "unusual" shopping pattern, it also shows a heavy reliance on Marathon for its food, drinks and other items stocked by Marathon, at times when no other stores in the area are open.

### Credit/Debit Review #14

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 10/12/17 | 11:43:40 | $ 2.99 | MC | Inside Payment |
| | | | 10/12/17 | 12:52:05 | $ 9.89 | MC | Inside Payment |
| | | | 10/12/17 | 14:33:09 | $ 19.89 | MC | Inside Payment |
| | | | 10/12/17 | 14:34:08 | $ 7.99 | MC | Inside Payment |
| | | | 10/12/17 | 15:32:11 | $ 9.89 | MC | Inside Payment |
| | | | 10/12/17 | 16:55:09 | $ 6.34 | MC | Inside Payment |

The Marathon customer above made 6 transactions, on the same date, beginning at 11:43 AM and ending at 4:55 PM. The transactions reflect an "unusual" shopping pattern with the purchases spread throughout the late morning and late afternoon. This shows a reliance on Marathon for its food, drinks and other items stocked by Marathon, even when there are other stores open (suggesting customers shop at Marathon, by choice, because of distance and comfort level). This also shows an "unusual" shopping and/or lifestyle habit of visiting the same store 6 times within one day, most within 1-2 hours of each other. Further, this also shows 2 transactions completed in less than a minute span of time, and 3 of the 6 transactions ending in 89 cents and above $9.00.

## Credit/Debit Review #15

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 09/13/17 | 00:55:54 | $ 2.89 | Visa | Inside Payment |
| | | | 09/13/17 | 00:56:16 | $ 2.00 | Visa | Inside Payment |

The Marathon customer above made 2 transactions, on the same date, at 12:55 AM and 12:56 AM one of which ended in 89 cents. These purchases show a heavy reliance on Marathon for its food, drinks and other items stocked by Marathon, at times when no other stores in the area are open. Further, this also shows 2 separate transactions, by the same customer, completed with only 22 seconds between them

## Credit/Debit Review #16

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 09/07/17 | 02:37:32 | $ 10.00 | Visa | Inside Payment |
| | | | 09/07/17 | 02:38:35 | $ 7.50 | Visa | Inside Payment |
| | | | 09/07/17 | 05:57:39 | $ 4.77 | Visa | Inside Payment |
| | | | 09/07/17 | 07:35:53 | $ 5.45 | Visa | Inside Payment |

This Marathon customer made 4 transactions, on the same date, starting at the very early hour of 2:37 am and ending at 7:35 AM. Not only does this reflect an "unusual" shopping pattern, it also shows a heavy reliance on Marathon for its food, drinks and other items stocked by Marathon, at times when no other stores in the area are open.  Additionally, this also shows 2 separate transactions, by the same customer, completed within a span of just over one minute.

## Credit/Debit Review #17

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 12/25/17 | 18:02:22 | $ 189.98 | MC | Inside Payment |
| | | | 12/25/17 | 18:03:47 | $ 98.89 | MC | Inside Payment |
| | | | 12/25/17 | 18:07:12 | $ 89.89 | MC | Inside Payment |

This Marathon customer made 3 transactions, on the same date, all within a 5-minute span of time, 2 of the 3 ending in 89 cents and all above $9.00. Considering these transactions were all made on Christmas Day, likely when other food stores are closed, shows a heavy reliance on Marathon for food and drinks "more than snacks," as the amounts suggest the purchase of last minute food and drinks for the holidays—which foods were offered by Marathon when they were accepting SNAP/EBT benefits.

### Credit/Debit Review #18

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 11/23/17 | 04:52:45 | $ 8.26 | Visa | Inside Payment |
| | | | 11/23/17 | 07:55:57 | $ 5.18 | Visa | Inside Payment |
| | | | 11/23/17 | 07:57:08 | $ 12.77 | Visa | Inside Payment |
| | | | 11/23/17 | 16:03:27 | $ 16.89 | Visa | Inside Payment |
| | | | 11/23/17 | 17:30:59 | $ 19.89 | Visa | Inside Payment |

This Marathon customer made 5 transactions, on the same date, beginning at 4:52 AM and ending at 5:30 PM. This shows an "unusual" shopping and/or lifestyle habit of visiting the same store 5 times within one day, with 2 of the transactions occurring less than 2 minutes apart. Further, this also shows 2 of the 5 transactions ending in 89 cents and over $9.00.

### Credit/Debit Review #19

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 12/29/17 | 00:17:08 | $ 7.50 | MC | Inside Payment |
| | | | 12/29/17 | 11:44:27 | $ 31.39 | MC | Inside Payment |
| | | | 12/29/17 | 11:45:26 | $ 24.88 | MC | Inside Payment |
| | | | 12/29/17 | 15:09:43 | $ 6.00 | MC | Inside Payment |
| | | | 12/29/17 | 20:17:00 | $ 8.00 | MC | Inside Payment |

This Marathon customer made 5 transactions on the same date, beginning at 12:17 AM and ending at 8:17 PM. Not only does this show the pattern of irregular schedules and/or shopping habits, specifically, visiting the same store 5 times in one day, it also shows a reliance on Marathon for food, drinks and other items stocked by Marathon, at times when no other stores in the area are open. Further, this also shows 2 transactions completed in less than 1 minute, not only showing the speed at which the Marathon's cashiers can process purchases, but also the same customer making separate purchases, back-to-back

### Credit/Debit Review #20

| CC Acct No Pt 1 | CC Acct No Pt 2 | CC Acct No (Last 4) | Transaction Date | Time 24 | Gross Amt | Card | Payment Method |
|---|---|---|---|---|---|---|---|
| | | | 06/09/18 | 09:17:29 | $ 65.02 | Visa | Inside Payment |
| | | | 06/09/18 | 13:40:25 | $ 9.99 | Visa | Inside Payment |
| | | | 06/09/18 | 13:43:02 | $ 13.89 | Visa | Inside Payment |
| | | | 06/09/18 | 13:43:41 | $ 8.99 | Visa | Inside Payment |

This Marathon customer made 4 transactions, on the same date, with 3 of those transactions completed within a 3-minute time span (2 of those completed only 39 seconds apart). All 4 of these transactions are over $9.00, with one ending in .89. The pattern of these transactions suggests the

customer's need to, perhaps, make separate shopping trips due to the lack of shopping carts and/or baskets in which to carry the items, or perhaps to walk back to their home, then return later to finish shopping. This could also, simply, speak to the convenience of and preference to shop at Marathon, even when other stores are open.

In sum, Marathon's credit and debit card review demonstrates for this Court the specific purchasing habits and patterns of the prototypical Marathon customer.  Not utilizing an optical scanner or a sophisticated inventory management or point-of-sale system, Marathon cannot affirmatively attest to the specific goods and/or services represented by the above purchase transactions.  Likewise, Marathon is not suggesting that all transactions referenced above are food purchases.  Marathon acknowledges that the above transactions may include purchases of gas, household items, and/or other non-SNAP eligible items.  But that is not the point.[7]

The point to be made here, as is relevant to the government's disqualification decision, is the "pattern" of transactions conducted by Marathon customers due to their irregular shopping habits, as described more fully above.

For example, the government suggests that "too many" SNAP transactions end in 89 cents (in this case, a mere ███ ).  The government then makes the inference that with this number of 89-cent transactions, the 89-cent figure is a "contrived" transaction amount indicative of trafficking.

If that is the case, it must naturally follow that non-SNAP Marathon purchases should not often end in 89 cents.  According to the government, the "89-cent" figure is contrived only to hide trafficking; and consequently, these transactions really should not end in 89 cents.  The credit and debit card transaction data, however, show otherwise.  Ending transactions in 89 cents is very common at Marathon based upon its pricing structure, as shown by the credit/debit summaries.

---

[7] In its Motion for Summary Judgment, Defendant seemingly anticipates the usefulness of credit/debit card transaction data, as compared to EBT transactions, by preemptively asserting that this data "has little to no relevance."  (Def. Motion at PAGEID 373).

Likewise, the credit and debit card transaction data also show how common it is for Marathon customers to engage in repeated transactions on the same day, and in many cases back-to-back, within a matter of seconds.  This is typical at Marathon Food Center.

In its investigation, the government identifies a mere set of ▮ repeated transactions over a six-month time period.  Marathon, on the other hand, has identified ▮ repeated credit/debit card transactions which took place within the same timeframe.  In short, repeated and successive transactions are the norm at a store like Marathon; and the data bear this out.

## V.   SUMMARY OF EVIDENCE SUBMITTED BY MARATHON

To survive a summary judgment, the Sixth Circuit requires that "a plaintiff in a Food Stamp Program disqualification case must raise material issues of fact as to *each* alleged violation." *McClain's Mkt. v. United States*, 214 Fed.Appx. 502, 505 (6th Cir.2006) (*citation omitted*; *emphasis in original*); *see also Ganesh v. United States*, 658 Fed.Appx. 217, 221 (6th Cir.2016).

In *McClain's Mkt.* and *Ganesh*, the SNAP retailer failed to raise material issues of fact as to each alleged violation, thus resulting in summary judgment in favor of the government. In *McClain's Mkt.*, the SNAP retailer did not "directly explain any of the 149 unusual transactions." *McClain's Mkt.* at 505.   In *Ganesh*, the SNAP retailer explained some, but not all, of the transactions.  *Ganesh* at 221.

Here, and to the contrary, Marathon has specifically explained (and successfully rebutted) each and every transaction flagged or identified by the government, thereby meeting the evidentiary requirements imposed by *McClain's Mkt.* and *Ganesh*.  But Marathon Food Center's evidence does not stop there.  In addition to its own specific rebuttal evidence, Marathon offers sworn declarations from several SNAP recipients identified in the government's "trafficking"

investigation, as well as declarations from other SNAP recipients who are frequent customers of Marathon.

In sum, and unlike the SNAP retailers in *McClain's Mkt.*, *Ganesh*, and other SNAP disqualification cases, Marathon has submitted the following evidence to support its position:

- A sworn declaration from Marathon's General Manager, attesting to the bona fide nature of each and every SNAP/EBT transaction "flagged" by the government and providing specific evidence contradicting Defendant's speculation and innuendo.

  o Included with Marathon's declaration is evidence of: Marathon's pricing structure; Marathon's inventory existing during the relevant review time; and customer shopping and spending patterns.

- Sworn declarations from the other two Marathon employees who worked the cash register during the relevant review period.

- Sworn declarations from four SNAP recipients identified in the government's investigation as having engaged with Marathon in a "trafficking" scheme, one of whom was specifically reviewed within Defendant's individual analysis of five Households.[8]

- Sworn declarations from three SNAP recipients who are loyal customers of Marathon Food Center.

- A credit and debit card transaction summary comparing Marathon's credit and debit card transactions to the government's "flagged" EBT transactions during the relevant review period.

## VI.    MARATHON IS ENTITLED TO SUMMARY JUDGMENT

Based upon the evidence submitted herein, as summarized above, Marathon is entitled to summary judgment in its favor, REVERSING the Agency Decision. *See Skyson USA, LLC v. United States*, D.Haw. No. 09-00278 BMK, 2010 U.S. Dist. LEXIS 15108, at *12-13 (Feb. 22,

---

[8] Notwithstanding that the data maintained by ODJFS is significantly out of date and of minimal value because the contact information is not accurate, Marathon nonetheless was able to secure four sworn Declarations from SNAP recipients.  Approximately two-thirds of the SNAP recipients, and likely many more, did not have valid telephone numbers registered with ODJFS.  The telephone number associated with each of these SNAP recipients was either disconnected, out of service, or simply the wrong number.  Similarly, many of the addresses were not valid mailing addresses.

2010) (granting summary judgment to the SNAP retailer, reversing the agency's decision, based upon evidence submitted by the retailer).

In response to the government's speculation and unsupported conclusory allegations of "trafficking" in SNAP benefits, Marathon has submitted uncontroverted material facts establishing that it unequivocally did not traffic SNAP benefits in any way. Simply put, Defendant possesses no evidence to the contrary. Therefore, given that Marathon has demonstrated the absence of any genuine issues of material fact, the burden shifts to the government to show that summary judgment should not be granted in Marathon's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986).

Accordingly, Marathon respectfully submits that it is entitled to summary judgment as a matter of law, REVERSING the Agency Decision disqualifying Marathon from participating in the SNAP program.

## VII. <u>CONCLUSION</u>

Based on speculation, innuendo, and cherry-picked statistics, the federal government alleges three "patterns" indicative of SNAP "trafficking:" (i) an unusual number of transactions ending in a same cents value; (ii) repetitive transactions in a set period of time by same household/account; and (iii) excessively large purchase transactions were made from recipient accounts.

Marathon, located in a confirmed food desert, offers specific uncontroverted evidence in response to <u>each and every</u> transaction identified or "flagged" in the government's investigation. That is the evidentiary standard imposed by the Sixth Circuit in SNAP trafficking cases, and Marathon has done exactly that.

There is nothing unusual or uncommon with the transactions conducted by Marathon's customers, which transactions happened to be "flagged" by the government's "one-size-fits-all" algorithm. As required by *McClain's Mkt.* and *Ganesh*, Marathon has offered evidence of, and directly explained, each and every transaction.

Defendant, on the other hand, is unable to meet its summary judgment burden and offer evidence establishing a genuine issue of material fact. For these reasons and for the reasons outlined herein, Defendant's Motion for Summary Judgment should be denied, and Plaintiffs' Cross-Motion for Summary Judgment should be granted.

In sum, based on Sixth Circuit precedent, this Court is left no choice but to REVERSE the Agency Decision and enter judgment in Plaintiffs' favor.

<div style="margin-left: 50%;">

Respectfully submitted,
**LUPER NEIDENTHAL & LOGAN**
A Legal Professional Association


/s/ Matthew T. Anderson
_____
Matthew T. Anderson  (0082730)
1160 Dublin Road, Suite 400
Columbus, Ohio 43215-1052
Phone: (614) 221-7663
Fax: (866) 345-4948
Email: manderson@LNLattorneys.com
*Attorney for Plaintiffs*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed electronically with the Court using the CM/ECF system on this 13th day of October, 2020, which will send notification of such filing to all attorneys of record.


/s/ Matthew T. Anderson

_____

Matthew T. Anderson (0082730)